FRANK R. PETTIT and others *vs.* STATE INSURANCE COMPANY, of Des Moines, Iowa.

July 19, 1889.

Fire Insurance—Description of Property—Rule of Construction—Elevator and Annex.—A certain grain elevator was constructed in several parts, but so connected as to be operated as one structure, and designated by one common name. To distinguish the main or principal building from the addition, which was connected with it by covered passage-ways through which the machinery was operated, it was called the "Main Elevator Building" and the addition was known as "Annex A." *Held*, that grain in "Annex A" was included in a policy of insurance describing it as being in the elevator, under the general description or name applied to the entire structure; and where the several parts were similarly constructed and covered, language used describing the elevator "as a frame, iron-clad, metal-roof building, occupied for the storage and handling of grain," *held* equally applicable to the whole or either division of the elevator known by the general description; and that if there is doubt or uncertainty as to the meaning of the policy, it must be resolved in favor of the assured.

Same—Agent's Knowledge Presumed.—The agent of an insurance company taking a risk under such circumstances is presumed to be familiar with the construction of the building, and its divisions, manner of use, and description, and it was for him to limit the amount of insurance taken on grain therein as he might deem necessary after proper inquiry.

Same—Assured not Bound to know Company's Usage.—Where an elevator had been in operation but a short time, the assured are not bound

by any particular usage or rule of insurance companies in respect to risks upon grain therein, unless the evidence shows that notice thereof has been brought home to them.

Action on a fire-insurance policy. Appeal by defendant from an order of the district court for Hennepin county, refusing a new trial after trial by *Young*, J., and judgment ordered for plaintiff for $4,000 and interest from October 7, 1887.

*Keith, Evans, Thompson & Fairchild*, for appellant.

*M. B. Koon* and *Ralph Whelan*, for respondents.

VANDERBURGH, J. During and prior to the year 1887, plaintiffs were engaged in milling wheat in the city of Minneapolis, and from time to time purchased large quantities of wheat to be ground or disposed of by them, and stored in elevators in the city of Minneapolis. The St. Anthony Elevator, built by the St. Anthony Elevator Company, was completed in the spring or summer of 1887, and was situated with all its additions and appurtenances upon the lot described as "Auditors' Subdivision No. 21, Minneapolis, E. D., Minnesota." The entire property was described and known as "The St. Anthony Elevator." It consisted of an engine-house, elevator adjoining, containing all the elevating machinery in the establishment, and having in its storage bins a capacity of 500,000 bushels, and of an addition or extension, designated as "Annex A," in distinction from the building first described, which was called the "Main Elevator" or "Main Elevator Building," and about 300 feet distant, and having 80 bins with a capacity of 1,000,000 bushels. The two buildings were connected in their construction and were operated as one elevator, having passage-ways or galleries between them, covered and constructed in the same way as the buildings connected by them. For a more particular description we may refer to the findings of the trial court, which show: "That said parts of said elevator so designated as 'Main Elevator Building' and 'Annex A' were substantially identical in their construction and description, differing only in size and in the mechanical appliances used therein; that the said galleries connecting them as aforesaid are as follows; two galleries, one above the other, supported by trestles, which were sustained by

11 tiers of masonry, each of said galleries enclosed upon its sides, covered with metal roof, containing windows and a floor, and constituting a continuous passage-way from one part of said elevator to the other; the upper of said galleries running from the side of the Main Elevator Building to the upper story or bin floor of said Annex A, and the lower of said galleries running from the bottom of the bins within said Annex A to the second story of said Main Elevator Building; that the said belt-conveyor was as follows: a broad belt running along the entire length of said upper gallery; said belt when in use being propelled over rollers, and conveying upon its surface grain from said Main Elevator Building into said Annex A, where such grain was by a mechanical contrivance tripped off from said belt into a spout, which distributed it into the bins in said Annex A; said belt thence running along the entire length of said lower gallery into the Main Elevator Building, and conveying upon its surface grain received from the bottom of the bins in the Annex, back into the Main Elevator Building, as occasion required.

"That all the machinery for operating the entire elevator was contained in the Main Elevator Building; that said Annex A was so constructed that no grain could be received directly into, or be delivered directly therefrom, but all grain received therein passed, and by reason of the construction thereof was compelled to pass, first into said Main Elevator Building, where it was weighed and elevated, and from which it was passed over said belt conveyor along said upper galleries into said Annex A; and all grain delivered out of said last-named compartment of said elevator by reason of the construction thereof was compelled to pass therefrom over said belt conveyor, along said lower gallery, and thence into said Main Elevator Building, where it was weighed, and from which it was delivered into cars, or otherwise disposed of as occasion required; that said Annex A was so constructed that it could not be used for the purpose of receiving, handling, or storing grain except in connection with and as a part of said Main Elevator Building; that said entire plant as hereinbefore described, and situated as aforesaid, was generally and commonly known and designated by the name of 'The St. Anthony Elevator;' that said name applied to and covered the

different buildings hereinbefore described, taken together and constituting one whole and entire elevator plant, and not to any particular part thereof; that said St. Anthony Elevator Company held the whole thereof out to the public, and operated the same, for the purpose of receiving, handling, and storing grain, under the name of the St. Anthony Elevator, applying said name to, and covering, and intending thereby to cover, the different buildings hereinbefore described, taken together and constituting one whole and entire elevator plant."

The elevator in question was, as we have seen, a new one, having been built but a short time before the date of the insurance mentioned in the pleadings. The plaintiffs had never owned or insured any wheat therein before, and were not acquainted with the method of its construction or operation. On June 16, 1887, plaintiffs purchased the wheat which they claim is covered by the policy in question here, and which was then in the St. Anthony Elevator, stored in "Annex A," and on the same day applied to one Thompson, who was agent for defendant in Minneapolis and for several other insurance companies, and who had frequently taken for them risks on grain in other elevators, "to place $4,000 insurance for sixty days on grain in St. Anthony Elevator." No particular company was designated by them, that being left to the agent, according to their usual method of transacting business with him. The agent in response premised to do so, but made no inquiries in regard to the particular location of the grain in the elevator, whether in special bins, the "Annex," "Main Elevator Building" or otherwise. The agent afterwards, in pursuance of such application, issued the particular policy upon which this suit is brought. The entire elevator, including both the Annex and the Main Building, was destroyed by fire on July 19, 1887, and all the wheat therein, including plaintiffs', was destroyed or damaged by fire.

The principal question in the case and the one upon which the decision must turn is in respect to the sufficiency of the description made by the agent in drafting the policy, to cover the wheat intended to be insured. It reads as follows:

"Four thousand dollars on the following specified and located property, namely:

## "Grain in St. Anthony Elevator.

"$4,000 on grain, their own or held by them in trust or on commission, or sold but not delivered, while contained in the frame, iron-clad, metal-roof building, occupied for the storage and handling of grain, and known as the St. Anthony Elevator, situated in Auditors' Subdivision, No. 21, Minneapolis, E. D., Minnesota."

The contention of the defendant is that the special or more particular description is intended to limit the risk to the first or Main Elevator Building, and ought not to be construed to extend any further. It will be observed, however, that the language of the policy is not limited to the "Main Elevator" or "Main Elevator Building," which is the designation applied to the building nearest the engine-house, and is rather descriptive of the character and construction, and purpose and use of the building insured than necessarily intended to limit the risk to any part. And the conclusion is warranted from the evidence that the terms "Main Elevator" and "Annex" were convenient designations in the practical use of the elevator, just as special bins might be referred to, for the purpose of local description or identification. And the wheat was constantly being changed from the one division to the other as to and from different bins, for the purpose of ventilation and to prevent the mass of wheat from heating. But it is found that the whole structure and not one division merely is known as the St. Anthony Elevator, and the more particular reference to the iron-clad covering and use of the building applies as well to the whole as to each part or division; so that the description in the policy is fairly susceptible of the construction claimed for it by the plaintiffs, as intended to cover grain in any part of the elevator; and in such cases the rule is that the interpretation most favorable to the assured is to be adopted. *Olson* v. *St. Paul F. & M. Ins. Co.,* 35 Minn. 432, (29 N. W. Rep. 125;) *Blake* v. *Exchange Mut. Ins. Co.,* 12 Gray 265, 270. The plaintiffs reposed such trust in the agent of the defendant that it was left to him both to select the company and formulate the description in the policy, (and this he must have understood,) and it is to be presumed that he was familiar with the structure of the elevator, its divisions, manner of its use, and description; and if it was

necessary to limit the amount of insurance upon wheat in any part of the building, it was for him to make such inquiries as might be necessary for that purpose.    *Daniels* v. *Hudson River Fire Ins. Co.,* 12 Cush. 416, 430.    And the evidence is clearly insufficient to charge plaintiffs with notice of any particular usage or rule of insurance companies in respect to risks upon grain in this elevator.

The findings of fact, which are clearly supported by the evidence, are decisive of this case, and it is not deemed necessary to consider the assignments of error further.

Order affirmed.

The defendant having moved for a reargument, the following was filed August 20, 1889.

*By the Court.* · On a motion for reargument our attention is called to the fact that in the policy as copied in the opinion, the word "Elevator" is omitted before "building," but we think this makes no material difference in the construction.    It does not appear that the "Main Elevator Building" was intended, or that the language so used would not apply as well to the whole building as any part.

Motion denied.