## MAGNOLIA PETROLEUM CO. v. CONNEL-LEE et al. (No. 886—4548.)

Commission of Appeals of Texas, Section B.
Dec. 5, 1928.

W. H. Francis, A. S. Hardwicke, and Wallace Hawkins, all of Dallas, and Conner & McRae, of Eastland, for plaintiff in error.

Burkett, Orr & McCarty, of Eastland, for defendants in error.

LEDDY, J. Plaintiff in error manufactured a large amount of gasoline from casinghead gas produced from wells drilled on lands which it had leased from defendants in error.

It is shown without dispute that plaintiff in error paid defendants in error the one-eighth royalty on all the oil which flowed from these wells, and had also paid them $25 per year for each of the wells from which it used casinghead gas.

Defendants in error prosecuted this suit in an effort to recover a large sum, on the theory

that plaintiff in error was not entitled to manufacture gasoline from the casinghead gas obtained from said lease by mere payment of the $25 per well stipulated in the oil and gas lease.

The district court denied defendants in error any recovery for the gasoline manufactured from casinghead gas. On appeal the Court of Civil Appeals reversed the judgment of the district court, holding that defendants in error were entitled to recover the value of one-eighth of the gasoline manufactured from casinghead gas from said premises. See 279 S. W 597

The view we have taken of the legal questions controlling the disposition of this case renders it unnecessary to set forth the pleadings of the parties, as the basis for the recovery sought, and the defenses urged thereto, will be made to sufficiently appear in our discussion of the legal questions involved.

The oil and gas lease, which is the basis of this controversy, recites a consideration of $7,620 cash paid, for which the lessors conveyed to lessee "all of the oil, gas, and other minerals in and under" the land therein described, "with the right to enter thereon, open mines, drill wells, lay pipes, and erect all structures and appliances, necessary or convenient in searching for, producing, caring for, storing, and removing, any oil, gas, or other minerals found thereon." The lease further provided that when a well completed should be a "producer of oil or gas" the grant should remain in force for the full term of the lease, "*without the payment of any other sums of money or other thing than the royalties herein agreed upon and specified.*" Under the lease, lessee was allowed the free use of oil, gas, wood, and water, in operating and drilling wells on the premises, or lands adjacent thereto, and lessors were allowed free use of gas from any well producing gas thereon for one dwelling on the premises.

The parties to this contract fixed the specific compensation that should be paid to lessors for any minerals produced from the premises according to the following schedule:

1. One-eighth of all oil produced and saved to be delivered free of charge to tanks or pipe lines to the lessors' credit.

2. For each well producing gas only, sold or used off the premises, $200 per year.

3. "*For casinghead gas when sold or used off the premises, $25.00 per year for each well, payment for gas to be quarterly in advance.*"

4. For all other minerals, one-eighth of the net profits thereof.

As a basis for recovery on account of gasoline manufactured by lessee from casinghead gas produced from wells on the leased premises, defendants in error insist that casinghead gas is "oil" within the meaning and contemplation of the provision of the lease providing one-eighth royalty on all oil produced and saved from the premises. In support of this theory, a great deal of expert and scientific testimony was adduced. Plaintiff in error likewise introduced a number of expert witnesses who gave testimony to the opposite effect.

█ Under the plain terms of this contract, we do not regard this issue as material in determining the rights of the parties. Neither do we think it necessary to resort to rules of construction in order to determine the intent of the parties as to the compensation to be paid lessors for the casinghead gas produced under said lease. There are some rules applicable for the construction of written contracts, for the purpose of ascertaining from the language used the manner and extent to which the parties intended to be bound. Courts, however, are not permitted to resort to arbitrary rules of construction where the intention of the parties is expressed in clear and unambiguous language (Pierce-Fordyce Oil Ass'n v. Warner Drilling Co. [Tex. Civ. App.] 187 S. W. 516), but will enforce the contract according to its terms (Benskin v. Barksdale [Tex. Com. App.] 246 S. W. 360; Perry & Co. v. Langbehn, 113 Tex. 72, 252 S. W. 472; Rankin v. Rhea [Tex. Civ. App.] 164 S. W. 1095). As is well said by Chief Justice Cureton in Texas Farm Bureau Cotton Ass'n v. Stovall, 113 Tex. 273, 253 S. W. 1101:

"The primary test of the character of a contract is the parties' intention as manifested by its terms."

█ At the time of the execution of the oil and gas lease in question, the subject-matter dealt with by the parties was a common one. Oil, or crude petroleum, casinghead gas, or gas coming from an oil well, and dry gas, or gas from a well producing gas only, were well-known terms, and had acquired a definite, fixed, and popular meaning. In the absence of fraud, accident, or mistake, it will be conclusively presumed that the parties to a contract were familiar with and understood the subject-matter about which they have contracted (Elliott on Contracts, vol. 5, § 4209, Pettit v. State Ins. Co., 41 Minn. 299, 43 N. W. 378), and that the terms used by them were intended to be given their ordinary and popular meaning.

█ The contract made by these parties is too clear, plain, and unambiguous, to be misunderstood. It is open to but one construction. It was clearly recognized by this contract that from an oil well brought in on the premises there would be produced casinghead gas, and it was specifically provided what compensation the lessors should receive therefor. This court is asked to hold that because casinghead gas is shown to be the result of a separation of the lighter or volatile part of the oil that it should be paid for as oil when the parties have expressly contracted and agreed that it should be paid for in a particular way as casinghead gas. To so hold would require that this court write into the

contract language which the parties themselves did not place there. We would be compelled to make for the parties a new and different contract.

By the express terms of the granting clause of this lease, all of the casinghead gas or dry gas in and under said land was conveyed to and became the property of the lessee. Its only obligation to lessors with reference thereto was an agreement to pay them for any of the casinghead gas it might use, aside from gas necessary in operating the premises, the sum of $25 per year for each well it used such gas therefrom. Otherwise, lessors had no interest whatever in the substance defined by the express terms of the contract as "casinghead gas." Under the grant this became the absolute property of the lessee with all the attributes incident to or implied in legal ownership. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566; Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S. W. 297, 29 A. L. R. 607; Hager v. Stakes, 116 Tex. 453, 294 S. W. 835. Having by the specific terms of the contract purchased and become the owner of the casinghead gas which might be produced from wells drilled on said premises, lessee was privileged to make such use of this gas as it might see fit without (as stated in the lease) *the payment of any other sum of money or other thing than the royalty herein agreed upon and specified."*

The fact that casinghead gas contained in vaporous form a substance which might be scientifically or in a technical sense termed "oil" cannot have the effect of modifying or changing in any way rights of the parties to this contract, as lessee's purchase of the casinghead gas produced from any well necessarily included all of the constituent elements it contained. It acquired these elements by its purchase as much so as it became the owner of the constituent elements contained in seven-eighths of the oil, to which it also had absolute ownership, subject only to payment of the one-eighth royalty.

At the time this lease was executed, "casinghead gas" was universally known and understood to be the gas which was emitted from a producing oil well. In fact, the wet or gasoline content of such gas was one of the characteristics distinguishing it from gas produced from a well producing gas only, which was denominated as dry gas. Westcott, Handbook of Casinghead Gas (2d Ed. 1918) p. 6, contains this definition of "casinghead gas":

"Casinghead gas is the gas that flows from oil wells coming out between the casing and the tubing."

Page 52, Id., contains this:

"Casinghead gas is the name given to the gas which flows from oil wells, and as a rule comes from the same sand or formation as the oil."

Johnson and Huntley's text entitled "Oil and Gas Production," at page 170, contains this statement:

"Casinghead gas is the term used to describe the gas accompanying the oil in an oil well, which usually contains gasoline vapor."

The United States government, in the department regulating royalties from casinghead gas, by its rules defines such gas as follows:

"Casinghead gas: The gas from an oil well coming through the casing with oil from an oil producing strata."

The parties to this lease separated the different substances which they contemplated might be produced from the leased premises, and in language too clear to admit of controversy, fixed a definite and specific compensation for each of these substances. It must be held that in making this separation the terms employed were intended to be used as they were popularly known and understood, and we cannot assume that it was contemplated such terms should be given a technical or scientific meaning. At the time the lease was executed, the average person would have defined casinghead gas as being the gas which was produced from an oil well, and it is clearly in this sense the parties contracted. It is not, and we think could not, be claimed that the parties to the contract did not know at the time it was made that casinghead gas contained a gasoline element. They had the legal right to provide that for all oil or casinghead gas lessee should pay one-eighth of the amount produced. They did not see fit, however, to make such a contract. Instead of doing so, they separated these two substances, and placed therein their own ideas as to how each should be paid for, and we are not authorized to alter or modify that contract, even though subsequent developments have made the same an extremely profitable one for the lessee.

It is argued by defendants in error that after the gasoline content, or oil, as it is termed, has been removed from the casinghead gas, the residue gas is still casinghead gas, for which lessee agreed to pay at the rate of $25 a well per year. A complete answer to this contention is that it is not the character of casinghead gas the parties intended to and have covered by the specific terms of their contract. It clearly appears from this contract that the parties contemplated that if a well was drilled on the leased premises there might be produced therefrom oil in liquid form, for which provision was made for the payment *in kind* by providing that one-eighth thereof should be delivered to the lessor into the pipe lines or tanks on the premises. Under the agreement casinghead gas was to be paid for in an entirely different manner. By the express terms of the grant the ownership

thereof was in lessee, subject only to its duty to pay lessors the sum of $25 per well when it sold or used the same off the premises.

It is difficult to understand or appreciate upon what theory it can consistently be held that lessee in purchasing casinghead gas did not obtain title thereto as the same was universally and popularly known, that is, as it was produced from the well, instead of the residue gas after it had gone through an elaborate and expensive plant for the purpose of having the wet or gasoline content removed therefrom. While the evidence in this case was conflicting as to whether casinghead gas was "oil," there was no evidence showing that the vaporous substance produced from wells on the leased premises which was used by lessee in manafacturing gasoline was not "casinghead gas," for which lessee had agreed to pay an annual rental of $25 per well.

The parties to this contract by language certain, specific, and definite, separated the various substances expected to be produced from wells drilled on the premises, and specifically fixed the compensation to be paid for each, and for this court to separate these substances in any different way or provide another and different compensation would be to substitute an entirely new contract for the one made by the parties.

It may be admitted that casinghead gas contains an oil content, which can be extracted therefrom in the form of gasoline by a process of refining or distillation. This fact, however, in no way militates against lessee's right, under the terms of its purchase, to all of the elements composing such gas. If lessors desired to obtain the advantage of receiving payment for a constituent element of casinghead gas, they should not have solemnly agreed to sell casinghead gas containing such element for the sum provided in the lease. Provision could easily have been made for the sale of casinghead gas after it had been denuded of its oil or gasoline content, but we may search the lease contract in vain for any provision designed to accomplish this purpose. There is no attempt whatever to put any character of limitation or reservation either in the clause granting all gas or that providing compensation for casinghead gas.

We think the construction sought to be invoked by defendants in error would require a double payment for casinghead gas, when no such payment was contemplated by the contract. This contract might be well likened to one where A, the owner of a lake, leases the same to B, providing that B should pay so much per ton for all ice cut from the lake, and so much per barrel for all water taken therefrom. Under such contract, B could not be required to pay for water that was taken in the form of ice and paid for at the compensation stipulated, even though the ice had subsequently been converted into water, and this notwithstanding it could be indisputably shown that the ice was water in a solid form. So, in this case, even if it be conceded that casinghead gas is oil, it has been expressly treated by the parties as a separate and distinct substance, and a different method of payment provided. Therefore, when payment is once made in full accordance with the terms of the contract, the lessor's right to have those substances further separated and subdivided and to demand pay under such subdivision is foreclosed.

If the lessee had contracted with a third party to sell all of the casinghead gas produced from these premises for so much per thousand cubic feet, and had paid lessors the sum of $25 per well, what provision of this contract would it have violated? Its act would have been in strict compliance with the terms thereof, as the lease expressly permits it to sell "casinghead gas" off the premises by paying $25 per year per well. Undeniably, the vaporous substance sold by it under such contract would have been the same "casinghead gas" which it used in the manufacture of gasoline. Under such contract, could not such third party have forced lessee to have delivered the casinghead gas as produced from the well?

Again, if the parties had contemplated any further separation of the substances expected to be produced from the premises than they had made in the lease, it seems clear they would have made some provision for an accounting therefor. The lease may be searched in vain for any provision beyond the payment of $25 per well. Further, it is a significant fact that payment for casinghead gas was to be made *quarterly in advance*. It could not, of course, be known in advance how much gasoline could be taken therefrom, and there is no provision whatever fixing any time in which lessee would be required to pay for gasoline taken from casinghead gas.

Defendants in error further insisted as a ground of recovery on account of the manufacture of casinghead gasoline that it was not contemplated by the parties at the time the lease was made that gasoline would be manufactured from casinghead gas, and that the minds of the parties did not meet on such question; hence they are entitled to recover all of the casinghead gasoline, less actual cost of manufacture. We think this contention is equally untenable. It is wholly immaterial what use the parties expected to make of casinghead gas. When lessee acquired the title and ownership of this gas, as it did under the granting clause of the lease, it had the legal right to make any use thereof it saw fit. The fact that scientific progress and development has made possible a greater and more profitable utilization of casinghead gas than existed at the time the lease was executed is no ground for avoiding the plain terms of the contract by which les-

see purchased the casinghead gas. This advantage was one which lessee has bought and paid for. Wilson v. King Smith Refining Co., 119 Okl. 256, 250 P. 90; Shaw v. Fender, 138 Ga. 48, 74 S. E. 792; McRae v. Smith, 164 Ga. 23, 137 S. E. 390; Gray Lumber Co. v. Caskin, 122 Ga. 342, 50 S. E. 164.

■■ It is further insisted by defendants in error that they should be permitted to recover one-eighth of the value of the gasoline manufactured by lessee from the casinghead gas on the theory that the stipulated consideration of $25 per well for casinghead gas provided in the lease was wholly inadequate, unjust, and unconscionable, and therefore void, and that they should be permitted to recover a reasonable royalty, which they alleged to be one-eighth thereof. It is a misnomer to say that $25 per well is the sole consideration paid by the lessee for casinghead gas. The lease, as before stated, recites a cash consideration of $7,620 paid at the time when the lease was in wildcat territory and when it was purely speculative and conjectural whether either oil or gas would be discovered thereon. This amount, plus the large sum which it would take to drill a well, plus the other royalty provisions lessors were to receive under the contract, is the real consideration for the entire contract, including casinghead gas, and of course the same is legally adequate. If, in fact, lessee had paid only the down cash payment in consideration for the conveyance of all the oil, gas, and other minerals on the premises, it would have been a good and valid consideration, even though no royalty had been provided for, as it has been repeatedly held that in the absence of fraud or overreaching, the slightest consideration for this character of contract is legally sufficient. Waskey v. Chambers, 224 U. S. 564, 32 S. Ct. 597, 56 L. Ed. 885, Ann. Cas. 1913D, 998; Heard v. Pratt (Tex. Civ. App.) 257 S. W. 660; Smith v. Carpenter (Tex. Civ. App.) 257 S. W. 637; Hitson v. Gilman (Tex. Civ. App.) 220 S. W. 140. As the down cash payment and provision for drilling a well would alone have constituted adequate consideration for all of the mineral rights, however valuable they may have subsequently proved to be, the consideration for casinghead gas cannot be held inadequate, however small the same may be.

■ The insistence is also made that defendants in error should be permitted to recover one-eighth of the value of the gasoline produced from casinghead gas under the theory that it is neither gas nor oil, but that it is a "mineral" within the contemplation of the provision requiring lessee to pay "for all other minerals one-eighth of the net proceeds thereof."

Lessors would no more have the right to separate a mineral substance from casinghead gas and receive additional compensation than it would have to separate any minerals from the seven-eighths of the oil belonging to lessee and claim compensation for it as other minerals. Whatever minerals were contained in casinghead gas as the same was known, defined, and popularly understood at the time of the execution of the lease, were included in the sale thereof at the compensation expressly stipulated therefor. The term "other minerals" refers to separate and distinct minerals not covered by the terms oil, gas, and casinghead gas.

If the lease involved had only covered oil produced from the premises and been wholly silent as to casinghead gas, and the lessee had under such circumstances extracted oil from casinghead gas, then lessor's claim for additional compensation would present an altogether different question from that presented by this record. In such a case, the situation would be similar to that involved in the case of Livingston Oil Corporation v. Waggoner (Tex. Civ. App.) 273 S. W. 903, in which the Supreme Court denied a writ of error. That case is relied upon by defendants in error to sustain a right of recovery in this case. It is, however, clearly distinguishable from this case, in that the lease involved made no provision for the payment of casinghead gas, and, further, it was expressly found by the trial court that from the very beginning both parties to the contract construed the one-eighth royalty provision to apply to gasoline manufactured from casinghead gas, and payment was made accordingly. The facts, therefore, of that case, are altogether different from those of this case. In fact, under different oil leases, each case must be determined by the particular wording of the contract involved.

Little aid can be derived from the decisions of the courts of other states on this question. Such decisions are in some instances affected by a different rule as to vesting the title to the oil and gas under a mineral lease, and in others the provision of the lease construed are variant from those involved in this case.

Defendants in error strongly rely upon the case of Gilbreath v. State Oil Corporation (C. C. A.) 4 F.(2d) 232. The lease in that case, as in Livingston v. Waggoner, supra, made no reference whatever to casinghead gas; hence it is clearly distinguishable from the case at bar.

■■ Upon the trial of this case a number of issues presenting the defendants in error's case as pleaded were submitted to the jury and answered in their favor. The court disregarded these findings, and entered judgment for the plaintiff in error on the causes of action for recovery on account of the manufacture of casinghead gasoline. The general rule is well established that the court is not authorized to render a judgment notwithstanding the findings of the jury. Fant v. Sullivan (Tex. Civ. App.) 152 S. W. 515;

Thornton v. Athens National Bank (Tex. Civ. App.) 252 S. W. 278; Taylor v. Davis (Tex. Civ. App.) 234 S. W. 104; Lemm et al. v. Miller et al. (Tex. Civ. App.) 245 S. W. 90. Where, as in this case, under no view of the pleadings and evidence the plaintiff is entitled to recover, the submission of the issues and the findings of the jury are immaterial and may be ignored by the court. It was therefore entirely proper for the court to disregard the findings of the jury and render judgment for plaintiff in error. Hays v. Stone, 36 Tex. 181; Baker v. Coleman Abstract Co. (Tex. Civ. App.) 248 S. W. 412; Ferguson v. Kuehn et al. (Tex. Civ. App.) 246 S. W. 674; Crowley v. Chapman (Tex. Civ. App.) 260 S. W. 231; Hicks v. Armstrong (Tex. Civ. App.) 142 S. W. 1195; Stark v. George, 252 S. W. 1053.

We recommend that the judgment of the Court of Civil Appeals be reversed and the judgment of the trial court affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, and that of the district court affirmed, as recommended by the Commission of Appeals.