**W. O. BLOCKER et al., Appellants,**

v.

**CHRISTIE, MITCHELL & MITCHELL CO., et al., Appellees.**

**No. 16137.**

Court of Civil Appeals of Texas.

Fort Worth.

Oct. 21, 1960.

Rehearing Denied Nov. 25, 1960.

Rogers, Eggers & Sherrill, Guy Rogers and J. N. Sherrill, Jr., Wichita Falls, for appellant.

Nolen Sewell, Decatur, Paul A. Smith and Tarlton Morrow, Houston, for appellee.

RENFRO, Justice.

From an adverse instructed verdict and judgment, the plaintiffs have appealed.

There were numerous parties in the law suit. We use the name Blocker, however, to designate plaintiffs, and Christie (Christie, Mitchell & Mitchell Co.) to denote defendants.

In 1955 a law suit was pending between plaintiffs and Christie. A settlement agreement was reached and made a part of a final judgment in the case. In the agreement, Christie was given an oil and gas lease on the Tadlock Survey in Wise County. Under the terms of the agreement Christie was authorized to pool the acreage for gas but not for oil. Christie produces gas from two wells on Blocker's land. Christie has placed all of Blocker's interest in the Tadlock Survey in two gas pooling units of 320 acres each. Blocker contends he is entitled to be paid for all condensate or distillate produced from the Survey, while Christie claims that Blocker pooled his interest in the condensate or

distillate produced from gas wells located upon the Tadlock Survey and consequently such production must be ratably shared with those in the gas pooling units.

The evidence showed that the liquids involved look like oil, taste like oil, smell like oil and are stored and sold like oil.

There are located at the top of the gas wells a "heater", a "separator" and stock tanks. When the gas leaves the well head it is gaseous, and is also gaseous as it existed in the well. The gas moves into the heater which causes a condensation. This condensate then moves into the stock tanks, and is allowed to accumulate until there is a sufficient amount to sell. The proceeds are prorated among all the leases.

Gas-oil ratio is determined under test directed by the Railroad Commission. The Railroad Commission defines a gas well as one where more than 100,000 cubic feet of gas for one barrel of liquid exist. In the instant wells, the producing ratios are approximately 200,000 cubic feet of gas for one barrel of liquid. The gravity of the liquid was considerably higher than that of frac oil.

In the agreement, and accompanying documents, heretofore mentioned, the parties agreed that zones capable of producing oil and zones capable of producing gas were to be treated separately; there was a producing gas formation back of the casing in one of the Blocker wells and it was provided that "this gas horizon will not be produced pending the ascertainment of such better market." The agreement recited that gas units on the basis of substantially 320 acres had been promulgated for the area by the Railroad Commission, that Christie hoped to discover a second gas well on the Tadlock or Blocker, and provided that to that end pooling of gas on a 320 acre basis would be authorized by Blocker. A part of the agreement read: "Notwithstanding anything contained herein to the contrary, it is agreed that Lessee shall not have the right to pool or unitize the land covered by this lease unless the 'Oil-Gas Ratio Test' on the gas zone or zones sought to be unitized, as herein provided, show a ratio of one (1) barrel or less of oil per 10,000 cubic feet of gas when measured on the pressure base fixed by the Railroad Commission of the State of Texas. Acreage covered by this lease shall not be pooled with other acreage as to oil."

In Hoffman's Voluntary Pooling and Unitization, p. 133, he states: "In general it may safely be said that as a matter of practical administration all of the production from an oil well, including the gas and distillate which may incidentally be produced from the well, should be treated as oil where oil rights have been pooled. Similarly, all of the production from a gas well, including the oil and distillate, if any, which may incidentally be produced from the well, should be treated as gas where the gas rights have been pooled." We think the above to be the proper rule, and, under the terms of the pooling agreement between the parties and in view of the evidence, should be applied in the instant case.

Our conclusion finds support in Lone Star Gas Co. v. Stine, Tex.Com.App., 41 S.W. 2d 48, 49, 82 A.L.R. 1299, wherein it is held: "An examination of the several instruments clearly discloses that the gas conveyed was not limited to any particular kind or character of gas, but the conveyance is all-embracing as regards gas, and covers and includes 'all natural gas.' The term 'all natural gas' would include all the substances that come from the well as gas, and that regardless of whether such gas be wet or dry. It is undisputed in the evidence that the term 'natural gas' includes numerous elements or component parts, but the very language of the conveyance is such as to include therein all these component parts which were in gaseous form when they came from the wells."

It was held in Humble Oil & Refining Co. v. Poe, Tex.Com.App., 29 S.W.2d 1019, 1020: "Plaintiff in error acquired the right to use the gas produced from a gas well it might drill on the premises covered by the lease by the payment of the agreed rental of $250 per annum. Having bought and paid for such gas it owned the same, including all of its constituent elements, and therefore had the lawful right to make such use of it as it might deem proper. Wilson v. King Smith Ref. Co., 119 Okl. 256, 250 P. 90; Shaw v. Fender, 138 Ga. 48, 74 S.E. 792; McRae v. Smith, 164 Ga. 23, 137 S.E. 390; Magnolia Petroleum Co. v. Connellee, supra." And in Magnolia Petroleum Co. v. Connellee, Tex.Com.App., 11 S.W.2d 158, 160, the court held: "The fact that casinghead gas contained in vaporous form a substance which might be scientifically or in a technical sense termed 'oil' cannot have the effect of modifying or changing in any way rights of the parties to this contract, as lessee's purchase of the casinghead gas produced from any well necessarily included all of the constituent elements it contained. It acquired these elements by its purchase as much so as it became the owner of the constituent elements contained in seven-eighths of the oil, to which it also had absolute ownership, subject only to payment of the one-eighth royalty."

We conclude that the condensate or distillate, under the record before us, was a constituent element of gas and under the pooling agreement payment therefor should be made proportionately to those with interest in the gas pool.

We overrule all of plaintiffs' points of error, and affirm the judgment of the trial court.

BOYD, J., not participating.