No. 45,166

Skelly Oil Company, *Appellee,* v. Nelia Savage, Frank Meek and Helen Meek, *Appellants,* and Clarence W. Ellis and L. Edna Ellis; D. H. Johnson and Marie Johnson; Jean Marple; Thomas J. Morris; Thomas M. Morris, Jr., Individually and Thomas M. Morris, Jr., Attorney in Fact for Richard L. Morris and Marion Frances Sweeney, *Appellees,* and Petroleum, Inc., a Corporation, *Third Party Defendant* and *Appellee.*

(447 P. 2d 395)

Opinion filed December 7, 1968.

*John M. Wall,* of Sedan, argued the cause and was on the brief for the appellants.

*W. F. Schell,* of Wichita, argued the cause, and *Richard Randall,* also of Wichita, was with him on the brief for the appellees.

The opinion of the court was delivered by

Schroeder, J.: This is an interpleader action by Skelly Oil Company (plaintiff-appellee), the purchaser of liquid hydrocarbons produced from a well located on a unitized leasehold, to construe an oil and gas lease and particularly the pooling or unitization clause therein which provides for the pooling of "gas rights only" where both natural gas and liquid hydrocarbons are produced from the same well.

The question presented is whether the ownership of the royalty interest in the liquid hydrocarbons is in the owners of the land on which the well is located or is in all of the owners of the pooled gas unit in proportion to their respective acreage contribution—in other words, whether the liquid produced is gas under the terms of the lease and therefore unitized, or is oil and not unitized or pooled.

The facts are not in dispute and are based upon the findings made by the trial court.

Four separate oil and gas leases were executed covering separate lands in Kingman County, Kansas, each of which contained a pooling or unitization clause which granted the lessee the right "to pool or consolidate this lease, the land covered by it, or any part thereof, with any other land, lease, leases, mineral estates, or parts thereof, but only as to the gas rights hereunder (excluding casinghead gas produced from oil wells) to form one or more gas operating units of not more than" 180 acres each.

The four leases in question were unitized pursuant to the pooling clause by a declaration instrument dated August 22, 1957, which was duly recorded in the register of deeds office of Kingman County, Kansas.

The unit consists of approximately 180 acres, and on the 22nd day of March, 1957, a well was completed on the Savage lease tract in such unit by the operator thereof, Petroleum, Inc. The owners of the Savage tract are the appellants herein. The well and the unit in question were located within the confines of the Spivey-Grabs Field, which is the subject of a basic proration order entered by the state corporation commission of the state of Kansas.

The trial court found:

"4. Defendant Petroleum, Inc., is the owner of a 1% interest and is the operator of said unit.

"5. Pursuant to the provisions of the Basic Proration Order for the Spivey-Grabs Field, an initial gas-oil ratio test was taken on the above described well known as the Savage No. 1 well, which test showed a producing ratio of hydrocarbons from said well of 93,617 cubic feet of gas per barrel of oil produced. Initial production of the Savage No. 1 well commenced on August 14, 1957, and during the life of said well the gas-oil ratio thereof increased and as of January 1, 1967, the said gas-oil ratio of said well was in excess of 200,000 cubic feet of gas per barrel of oil or liquid hydrocarbons.

"6. The Savage No. 1 well is a gas well, by definition under the Basic Proration Order for the Spivey-Grabs Field, having had at all times a producig gas-oil ratio in excess of 15,000 to one. In addition, the economic value of the gas production has greatly exceeded that of the liquid production.

"7. There is no separate oil zone existing in the Savage No. 1 well, and liquids produced from said well are associated with the gas in the upper portion of the Mississippian Formation, and such liquids are produced along with the gas and are transported to the producing formation to the well bore and to the wellhead by the differential in pressure existing in the reservoir and at the wellhead, which causes the flowing of gas through the formation and to the wellhead. No pumping equipment or other artificial or mechanical means of lifting or producing the fluids exists or is used on the well, and the gas cannot be produced without carrying with it the associated liquids.

"8. The liquids are separated from the gas on the lease premises by means

of a high pressure separator and water is then separated from the liquid hydro-carbons by means of a heater-treater.

"9. The gravity of the liquids as of the date of the hearing of the case was 47°, which is in the condensate range and in excess of the gravity of crude oil, such liquids being associated with and a component part of the gas in the reservoir.

"10. All of the acreage in the Savage Unit is productive of gas and liquid hydrocarbons in approximately the same gas-oil ratio, and a well drilled any-where on the unit would be a well substantially identical to the Savage No. 1 well. All of the lands in said unit have been attributed to the Savage well for allowable purposes by order of the State Corporation Commission.

"11. Gas and liquid hydrocarbons have been produced or drained from all of the tracts in the unit into the well bore of the Savage No. 1 well.

"12. Considering the amount of recoverable liquids in the reservoir under the Savage Unit and the cost of drilling, completing and equipping the well in the Mississippian Formation on the Savage Unit, it is uneconomic for the operator of the unit, or any other operator, to drill an additional well or wells on the non-drillsite tracts for the purpose of recovering separately by tract, oil or liquid hydrocarbons existing under such non-drillsite tracts.

"13. The non-drillsite mineral owners have executed a division order for the liquids on a unit basis, tendered to them by the original pipeline purchaser, Skelly Oil Company. The mineral owner under the drillsite (Savage Lease) has refused to execute such division order providing for division of liquids on a unit basis. Proceeds accruing to the royalty interest have been held in suspense by the pipeline purchasers."

The trial court further found that it was a common situation for wells in the area to produce both gas and liquids. It thereupon determined the proportionate royalty interest of the owners of the various leased tracts in the unit and concluded in part as follows:

"CONCLUSIONS OF LAW

"1. The Savage No. 1 well is now, and has been during its producing life, a gas well.

"2. Under ordinary circumstances the owner of the minerals under the well-site is entitled to the full share of the royalty from oil produced from this land. Although in this case the owners of the minerals under the Savage No. 1 have not specifically agreed to pool oil and liquid hydrocarbons produced from this well, neither have they specifically agreed that such oil and liquid hydrocarbons should not be pooled.

"3. When the Savage No. 1 well was brought in as a producer within the legally described field limits of the Spivey-Grabs Pool, which was governed by the provisions of the Basic Proration Order for the Spivey-Grabs Field as entered by the State Corporation Commission, and when such well was offi-cially tested and classified as a gas well by the Commission, then the lease con-tracts including the pooling agreements must be construed in the light of and as affected by regulations of the Corporation Commission.

"4. The fact that the drillsite oil and gas lease contains no separate pooling clause permitting the pooling of oil from an oil well, does not preclude the

pooling of liquids produced in conjunction with and as a by-product of the production of gas from the gas unit.

"5.  Considering the physical characteristics of the liquids involved, and the fact that the subject well is a gas well and that the liquids are associated with the gas and recovered and produced by reason of the operation of said well as a gas well, and the same must be separated from the gas only after hydrocarbons have been produced at the wellhead, such liquids should be deemed to be a part of the gas and should be considered as the proceeds from the gas for the purpose of payment of royalty and should be distributed on a unit basis.

"6.  The pooling clause under the drillsite Savage Lease in the last sentence thereof, does not specifically limit the spreading of royalty or production from the subject well to gas alone, but permits the distribution of 'royalty on production' from the unit to the separate tracts in the unit area on an acreage basis.

"7.  Since all tracts contain liquids, as well as gas, and the various mineral owners are thus contributing liquids under their lands to the production of the Savage well, an equitable construction of the pooling clauses, made in light of the facts and contentions existing at the time of the execution of the leases, requires a spreading of the royalty proceeds of not only the gas, but also the liquids from the Savage well.

"8.  Royalty from the sale of the oil and liquid hydrocarbons from the Savage No. 1 well belong to and should be distributed to the persons and in the proportion set forth above in paragraph 18 of Findings of fact. [The distribution is based on the proportionate acreage contributed by the various landowners to the unitized tract.]"

The trial court thereupon entered judgment for the respective parties distributing the proceeds from the sale of liquid hydrocarbons produced, as to the royalty interest, to the mineral owners under all of the tracts in proportion to the contributed acreage under each tract in the unit.

Petroleum, Inc., in its answer says:

"This case presents a novel question of law, not previously decided by the Supreme Court of Kansas, as to whether the production of oil from the Savage Unit should be distributed to the entire royalty ownership under the unit or only to the royalty owner under the drill site lease."

The lease here in question contained a pooling agreement granting the lessee the right to consolidate the lease in question to form "one or more gas operating units." The right to pool the lease was limited in that the leasing agreement authorized only the pooling of *"gas rights"* granted therein. We are confronted with the proposition, however, that nowhere in the lease is the term *"gas rights"* defined.

The lease further provided:

"The entire acreage pooled into a *gas unit,* shall be treated for all purposes, except payment of royalties on production from the *pooled unit,* as if it were included in this lease. In lieu of the royalties herein provided, lessor shall

receive *on production from the unit so pooled* only such portion of the royalty stipulated herein as the amount of the acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage *so pooled in the particular unit involved.*" (Emphasis added.)

The gas from the unit in question was sold to the Kansas Power and Light Company at a quoted rate per thousand cubic feet. The liquid produced was sold to the Skelly Oil Company at a quoted rate per barrel. The landowners in the unit, other than the appellants who are the drillsite landowners, claim the liquid produced is gas. The appellants, relying upon the foregoing language in the lease, and in particular the emphasized portion, contend the liquid produced is oil or liquid hydrocarbons and that this product was not unitized.

The basic consideration concerns the meaning of the terms used in the lease and the intent of the parties who executed the leases in question. The appellants argue in construing the lease, the court must apply the commonly-known and used meaning of the words rather than the scientific or technical meaning. (Citing, *Wolf v. Blackwell Oil & Gas Co.*, 77 Okla. 81, 186 Pac. 484; and 17 Am. Jur. 2d, Contracts, § 252, p. 644.)

They also rely upon 17 Am. Jur. 2d, Contracts, § 247, p. 637; and *Collier v. Monger*, 75 Kan. 550, 89 Pac. 1011, for the proposition that the language in an oil and gas contract will be given its ordinary and commonly understood meaning where no reason appears for doing otherwise.

The appellants rely upon the commonly accepted meaning of "gas" and "oil" and quote from various authorities in other jurisdictions discussing such definitions. Most of the cases upon which the appellants rely arise under the royalty clauses of oil and gas leases wherein the courts were attempting to determine whether the oil or gas royalty clauses should be applied. For example, *Vernon v. Union Oil Company of California*, 220 F. 2d 441 (5th Cir. 1959) involved the shut-in royalty clause, and more particularly whether the payment of shut-in royalty was countenanced by the lease referring to a well "producing gas only" where the well in question produced some liquid condensate.

The authorities touching the point here under consideration are scant. The decision is complicated by the fact that the liquid hydrocarbons with which we are concerned in the instant case change

from the gaseous state to the liquid state at some point in the production process prior to sale.

Distillate is spoken of in Volume 1 of The Law of Oil and Gas Leases by Earl A. Brown (2nd Ed.) in Section 6.07 as follows:

"Distillate or condensate (the terms are synonymous) is a liquid produced from gas wells, as distinguished from casinghead gas which is a saturated gas produced from oil wells. It is ordinarily found in the deeper sands, where pressures and temperatures are greater than those which occur in the shallower sands. Considerable amounts of this liquid are obtained from large gas wells producing from deeper formations,—ten, twelve to fourteen thousand feet in depth and even deeper. Of course, no question as to payment of royalty on this product exists under the later lease forms where the royalty clauses are specific. The problem arises under those leases which provide for royalties only on oil and gas, and perhaps casinghead gas.

"Distillate or condensate ordinarily exists in a gaseous state in the reservoir. This reservoir condition is occasioned by high temperatures and great pressures. Upon reduction of the temperature and release of the pressure by ordinary production methods the distillate liquefies and falls out of the gas in the separators connected with the mouth of the well. More liquid is obtained when the resultant gas is treated in a processing plant. The question is: 'Shall the distillate be classified as oil, or does it go with the "gas and gas rights"?' "

A noted author of the Oklahoma Bar in his work on oil and gas speaks of distillate in the following manner:

"The terms 'distillate,' 'condensate,' and 'natural gasoline' are commonly used interchangeably to describe the liquid hydrocarbons which may be extracted from natural gas produced from a well which produces gas only and does not produce crude oil. Such substance is to be distinguished from casinghead gas. Although there may not be a well defined distinction between distillate and casinghead gas from the standpoint of chemical composition, there is a well defined distinction between such substances from the standpoint of construction of mineral deeds and oil and gas leases. Casinghead gas is gas which is produced from an oil well, whereas natural gas and its constituent wet elements, distillate, are produced from a gas well.

"Most of the cases which have involved disputes over distillate are cases in which it has been necessary to identify distillate with some other substance. When the first disputes arose, the oil and gas leases in common use contained no special provision for distillate. The royalty clauses usually contained provisions for oil, simply, and for gas, simply. When gas wells were drilled which produced distillate, it became necessary for the courts to construe the oil and gas lease and to arrive at the intention of the parties on a subject which they did not have specifically in mind. Although there is a lack of uniformity among the states in the solutions found to a similar problem involving casinghead gas, there is considerable uniformity in the results of cases which have involved distillate. It has been generally recognized in the various jurisdictions with decisions on the subject that distillate is not oil but is a component of natural gas and that title to the gas carries with it the title to all of its components. To

the extent that there are variations within such general pattern, the variations are largely the result of peculiarities of the royalty clause under consideration." (3 Kuntz, Law of Oil & Gas, § 41.3 [*b*], pp. 345, 346.)

The work of Leo J. Hoffman, a member of the Texas Bar, entitled "Voluntary Pooling and Unitization," contains a section "Defining Pooled Substances" in which the following is stated:

". . . Moreover, if there is a question as to whether the production from the particular well on the unit is a pooled substance there is likewise a question as to whether the royalties on that production belong entirely to the owner of the tract on which the well is located or whether such royalties should be apportioned among all of the royalty owners in the unit. Probably most of the lease pooling clauses in common use provide for separate pooling as to oil and gas, but make no serious attempt to define the two pooled susbtances. In the usual case this poses no serious problem since most wells can be classified with reasonable certainty as being producers of one substance or the other. But the occasional borderline well can be exceedingly troublesome in this respect, as, for example, where what is ostensibly a gas well also produces large quantities of oil and distillate. *In general it may safely be said that as a matter of practical administration all of the production from an oil well, including the gas and distillate which may incidentally be produced from the well, should be treated as oil where oil rights have been pooled. Similarly, all of the production from a gas well, including the oil and distillate, if any, which may incidentally be produced from the well, should be treated as gas where gas rights have been pooled.* In case of doubt as to whether the particular well is an oil well or gas well the parties should generally be guided by the classification of the well which is made by the state conservation agency for purposes of regulation. However, such classification will not govern if the agreement of the parties provides otherwise for purposes of pooling. . . ." (pp. 132, 133.) (Emphasis added.)

Analogous to the present case on factual grounds is *Blocker v. Christie, Mitchell & Mitchell Co.*, 340 S. W. 2d 320 (Tex. Civ. App. 1960). There the land of the mineral owner was pooled under an agreement with other lands, which restricted the right to pool gas to a situation where the gas zone showed an oil-gas ratio test of one barrel or less per 10,000 cubic feet of gas. The agreement also provided that the acreage covered by the lease should not be pooled with other acreage as to oil. The drillsite mineral owner claimed that he was entitled to be paid for all of the liquids referred to in the opinion as condensate or distillate, produced from gas wells on his land, and the lessee appears to have claimed that such production should be ratably shared with those in the gas unit. The evidence disclosed that the liquids involved looked like oil, tasted like oil, smelled like oil, and that they were stored and sold like oil, although the gravity of the liquid was considerably higher than

that of frac oil. The court, after quoting the *Hoffman* citation set out above, stated as follows:

". . . We think the above to be the proper rule, and, under the terms of the pooling agreement between the parties and in view of the evidence, should be applied in the instant case.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"We conclude that the condensate or distillate, under the record before us, was a constituent element of gas and under the pooling agreement payment therefor should be made proportionately to those with interest in the gas pool." (pp. 321, 322.)

The appellants attempt to distinguish the *Blocker* case on the ground that it is a Texas case where the "in place" theory as to minerals is adopted. Oil and gas in Texas are subject to sale "in place." Therefore, the form of the substance as it exists "in place" determines its classification.

In Kansas the law is well settled that an oil and gas lease conveys no interest in real estate or the minerals in place, but that the lease is merely a license to explore. (*Shields v. Fink, Executrix,* 190 Kan. 17, 372 P. 2d 252; *Denver National Bank v. State Commission of Revenue & Taxation,* 176 Kan. 617, 272 P. 2d 1070; and *State, ex rel., v. Board of Regents,* 176 Kan. 179, 269 P. 2d 425.)

Based upon this distinction the appellants argue the royalty provisions of the oil and gas lease here in question must apply to the hydrocarbons produced, and not the "in place" theory. The appellants pursue this point by citing *Carlock v. Krug,* 151 Kan. 407, 99 P. 2d 858, for the proposition that liquid hydrocarbons belong to the owners of the land. There, however, the court was concerned with a lease on a quarter section of land where there was a subsequent division of ownership. The court held the owner of the separate parcel of land upon which the well was drilled, in the absence of specific provision or agreement to the contrary, was entitled to all of the royalties on oil production therefrom. In the opinion the court stated the Kansas rule to be that the owner of the land and those claiming under him own all of the oil produced from wells located on the land, and that owners of adjoining tracts must protect themselves by development of their own land.

Clearly, the *Carlock* case does not involve pooling rights under oil and gas leases, and as a consequence has little bearing on the question as to whether "gas rights" should include the associated liquids removed from the gas away from the well bore in the instant case.

The Texas court in *Blocker* refers to the liquid production as condensate or distillate, and it is clear from the facts in the instant case that the liquid hydrocarbons here in question are condensate or distillate, having a specific gravity higher than crude oil.

We see no valid grounds to distinguish the *Blocker* case which was decided on the "in place" theory in Texas from the facts in the instant case, even though Kansas does not adopt such theory. On the conceded facts in the instant case the production of the well on the Savage unit was captured at the wellhead in the gaseous form, and it was not until the associated liquids were separated from the gas away from the well bore that liquid hydrocarbons were available for sale. (See, *Matzen v. Hugoton Production Co.*, 182 Kan. 456, 321 P. 2d 576.)

Based upon the facts in this case, as shown by the findings of the trial court, we are persuaded by the foregoing authorities and hold that "gas rights" as used in the Savage lease should be deemed to include the associated liquids produced as a constituent element with the gas.

The unitization clause in the Savage lease by inference permits the inclusion of liquid hydrocarbons as being within the meaning of the term "gas rights."

The only exclusion from the term "gas rights" is casinghead gas produced from oil wells. Nothing else limits such term. In the last sentence of the pooling clause of the lease reference is made to "royalties" on "production" from the unit. Had the parties intended to exclude associated liquids produced from a gas well this sentence, which spreads the royalty on a unit basis, could have been clarified.

The foregoing construction of the lease is further fortified by a disclosure in the lease that the parties were all aware that a well capable of producing natural gas in the Spivey-Grabs Field would also produce condensate, distillate and other gaseous substances. This is indicated by the shut-in provision under the royalty clause of the lease which provides:

". . . (c) if at any time while there is a gas well or wells on the above land (and for the purposes of this clause [c] the term 'gas well' shall include wells capable of producing natural gas, condensate, distillate or any gaseous substance and wells classified as gas wells by any governmental authority) such well or wells are shut in, . . ."

The appellants argue the royalty clause in the lease which provides that royalties should be paid "(a) on oil, and on other liquid

hydrocarbons saved at the well" indicates an intention that liquid hydrocarbons are to be classified as oil. This is answered by a succeeding provision concerning gas to the effect that royalties should be paid "(*b*) on gas, including casinghead gas and *all gaseous substances.*" (Emphasis added.)

If a written contract is actually ambiguous concerning a specific matter in the agreement, such as the meaning of "gas rights" used herein, facts and circumstances existing prior to and contemporaneously with the execution of such contracts are competent to clarify the intent and purpose of the contract in this regard, but not for the purpose of varying and nullifying its clear and positive provisions. (*Maltby v. Sumner,* 169 Kan. 417, 219 P. 2d 395; and *Oliver v. Nugen,* 180 Kan. 823, 308 P. 2d 132.)

In this case all the leases in the unit were given and granted on lands within the legally described field limits of the Spivey-Grabs Pool in Kingman County, Kansas, which was governed by the provisions of the basic proration order for the Spivey-Grabs Field as entered by the state corporation commission of the state of Kansas. This order recognized that gas and oil or other liquids were associated together in the same Mississippian Reservoir, and that a need existed for classifying wells in the area. Had it therefore been desired and required by the lessors that liquids, known to exist in the area, be excluded from the term "gas rights" (as casinghead gas was), this could easily have been accomplished, but no such provisions were added.

The facts in the instant case disclose that liquid hydrocarbons existed along with the gas under all of the tracts in the unit, and that they have been and would continue to be produced into the well bore of the Savage No. 1 well. The fact that only small amounts of recoverable liquids were produced made it uneconomic for the operator of the unit, or any other operator, to drill any additional well or wells on the non-drillsite tracts for the purpose of recovering separately by tract oil or liquid hydrocarbons existing under such non-drillsite tracts. Obviously, the non-drillsite mineral owners would have no adequate remedy to protect themselves from drainage, if they did not share in the production of the associated liquids produced from the Savage well. The lands in the unit have been fully developed for gas purposes, and any attempt by the lessees of the non-drillsite tracts in the unit to cancel those leases for violation of the implied covenant to further develop would fail, con-

sidering the oil alone, because it would not be economic to drill a further well for this purpose. (*Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P. 2d 810.) Furthermore, if the present lessee should release the non-drillsite leases as to the oil rights only, the economic failure to warrant further drilling continues to exist, and anyone drilling a well on the non-drillsite tracts could not produce the gas, since those rights belong to the present lease owners.

Equity thus suggests a construction of the lease which would spread the royalties from liquid hydrocarbons ratably to all of the parties having an interest in the gas unit.

In conclusion we hold the condensate or distillate, on the admitted facts before us, was a constituent element of the gas produced and under the pooling clause of the lease payment therefor should be made proportionately to all of the parties having an interest in the gas unit.

The judgment of the lower court is affirmed.