No. 55,321

W. D. SHORT, *Appellant*, v. EARL A. CLINE; HAROLD S. CLINE; WARREN A. CLINE; WILSON E. CLINE; COLONIAL ROYALTIES, a Corporation; FLORA LEE CLINE, Individually and as one of the Executors of the Estate of William H. Cline, Deceased; WENDELL S. HANCHER; JOHN W. HANCHER; FANNY MCDONALD; JOHN MOYER; MRS. E. H. EVANS; G. STERLING YOUNG; ARCHIE HOWARD; MARY ALBERTA YOUNG; KATHERINE YOUNG GAYLE; CLARA I. YOUNG; DOROTHY M. YOUNG; PAXTON R. FIKE; JAMES HERMAN HANCHER; RAYMOND E. MATLOCKS; WILLIAM K. MATLOCKS; FIRST SENECA BANK & TRUST COMPANY; LAVERN BAUDER; MRS. FLOY SMITH; SO-ROY CORPORATION, a Corporation; JEAN K. CLINE, Executor of the Estate of Everett L. Cline, Deceased; ROBERT W. CLINE, Executor of the Estate of Lavern M. Cline, Deceased; ROBERT W. CLINE, Administrator of the Estate of Lorena C. Zaring, Deceased; FIRST NATIONAL BANK & TRUST COMPANY OF PONCA CITY, OKLAHOMA, Executor of the Estate of William H. Cline, Deceased; GERALDINE M. EVANS, DAVIS S. CLARK, and MELLON NATIONAL BANK & TRUST COMPANY, Administrators of the Estate of Ralph D. Evans, Deceased; VIRGINIA QUINN; ELWILDA MADGE MCCARTY; HELEN E. QUINN; ORESSA G. CROWDER; L. J. FULTON; ELIZABETH FULTON; ALEXANDRIA FERRARI; RAYNELL MARIE HOLTZ; AND THE UNKNOWN HEIRS, EXECUTORS, ADMINISTRATORS, DEVISEES, TRUSTEES, CREDITORS, AND ASSIGNS OF SUCH OF THE DEFENDANTS AS MAY BE DECEASED; THE UNKNOWN SPOUSES OF THE DEFENDANTS; THE UNKNOWN OFFICERS, SUCCESSORS, TRUSTEES, CREDITORS AND ASSIGNS OF SUCH DEFENDANTS AS ARE EXISTING, DISSOLVED, OR DORMANT CORPORATIONS; THE UNKNOWN EXECUTORS, ADMINISTRATORS, TRUSTEES, CREDITORS, SUCCESSORS AND ASSIGNS OF SUCH DEFENDANTS AS ARE OR WERE PARTNERS OR IN PARTNERSHIP; and THE UNKNOWN GUARDIANS, CONSERVATORS, AND TRUSTEES OF SUCH OF THE DEFENDANTS AS ARE MINORS OR ARE IN ANYWISE UNDER LEGAL DISABILITY, *Appellees*.

(676 P.2d 76)

Opinion filed January 13, 1984.

*Robert D. Steiger,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause and *John A. Herlocker,* of Herlocker, Roberts & Herlocker, P.A., of Winfield, was with him on the brief for appellant.

*Marion P. Mathews,* of Mathews, Taylor & Krusor, of Winfield, argued the cause and was on the brief for appellee Colonial Royalties, and *Donald Hickman,* of Dale, Hickman & Mills of Arkansas City, argued the cause and was on the brief for the remaining appellees.

The opinion of the court was delivered by

HOLMES, J.: In this action plaintiff/appellant seeks to quiet his title to the oil and gas under 160 acres of land in Cowley County, Kansas. The surface interest is not in issue. Defendants are natural persons, corporations or representatives of the estates of deceased persons who hold royalty interests in oil and gas production from the property. Plaintiff alleges these interests have terminated by reason of non-production, according to the terms of the instruments by which they were created. Defendants, on the other hand, contend the interests have not terminated. The case was submitted to the district court upon an agreed stipulation of the facts, the pretrial order, the deposition of plaintiff, and briefs of the law. In a painstakingly detailed decision the trial court found that defendants' interests had not terminated, and refused to grant plaintiff the relief sought. Plaintiff has appealed. The case was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c).

The stipulated facts, excluding the exhibits, pertinent to the issues on appeal read:

"1. The real estate which is the subject of the instant quiet title action is the East Half of the Northwest Quarter and the West Half of the Northeast Quarter of Section 20, Township 33 South, Range 3 East, Cowley County, Kansas.

"2. Norman Wertman acquired title to the aforesaid property from the United States of America on August 1, 1872.

"3. Norman Wertman died intestate on September 25, 1920, leaving as his heirs, his widow, Sarah Wertman, and three daughters, Laurette Spoon, Lillian Maud Fulton, and Nellie May Quinn.

"4. On January 30, 1923, Sarah Wertman, widow, Laura Spoon and F.M. Spoon, her husband, Maud Fulton and J.H. Fulton, her husband, and Nellie Quinn and E. M. Quinn, her husband, as lessors, executed a lease on the aforesaid real property to M. W. Baden, as lessee, for the sole purpose of exploring for oil and gas. A true copy of said oil and gas lease, marked Exhibit 'A', is attached hereto and made a part hereof. Production of oil from Bartlesville Sand on the land started within the term of the lease.

"5. In December, 1923, the aforesaid lessors executed a series of royalty conveyances to Perry A. Hoefer. A copy of the conveyances are attached hereto as

Exhibits 'B', 'C', 'D' and 'E', respectively, and are made a part hereof. These conveyances recognize that the grantors had executed an oil and gas lease on the said land and that such lease reserved to them as royalty one-eighth of all the oil and gas produced from said land. These conveyances transferred one-half of the grantors' royalty rights under the lease to the grantee, Hoefer. The term of the conveyances was 15 years if no oil or gas was found or produced on said land. If oil or gas was produced on said land, the agreement and the royalty rights of grantee thereunder were to be effective so long as production continued. The interests of some of the defendants, including Colonial Royalties Company, are derived through the above conveyances.

"6. Perry Hoefer thereafter assigned part of his interest to E. B. Cline and a part of his interest to assignors of defendant Colonial Royalties Company. Since then there have been a number of further assignments of the E. B. Cline royalty interest.

"7. On July 21, 1924, Sarah Wertman died intestate, leaving her three daughters, Lauretta Spoon, Lillian Maud Fulton, and Nellie Mary Quinn as her sole heirs.

"8. On July 18, 1944, Lauretta Spoon, widow, Lillian Maud Fulton, widow, and Nellie M. Quinn and E. M. Quinn, her husband, conveyed the aforesaid real property by warranty deed to R. O. Nelson. A true copy of said deed, marked Exhibit 'F', is attached hereto and made a part hereof; it provides in pertinent part that:

'. . . grantors hereby except and reserve the royalty from the Bartlesville sand now owned by them unto themselves for a period of time as long as the Bartlesville, the now producing sand, is being produced and operated. It being specifically understood the intention of this instrument is to reserve to the grantors the royalty which they now own and are receiving from the Bartlesville sand, and it being further specifically understood that cessation of operations for the purpose of water flooding this sand shall not make this reservation null and void. It, however, being specifically understood that when this present producing sand is entirely abandoned then this reservation of the oil rights shall become null and void and the oil rights retained by the grantors herein shall revert to the grantee herein, it being further specifically understood that the grantors are only reserving their share of the oil which is being produced from the horizon which lies immediately above the Mississippi lime in the Cherokee shale or the base thereof and which is referred to in that area as the Bartlesville, Burbank or Rainbow Bend sand, and that there is no intention herein for the grantors to reserve any oil and gas under any other horizon. It is not the intention of the grantors to retain any rights in the royalty herein-to-before conveyed in any sand or horizon.'

Certain defendants claim under the above reservations which they contend were extended by a pooling agreement executed in 1956.

"9. On March 29, 1956, a pooling agreement was executed creating the West Rainbow Bend Unit encompassing oil and gas leases on certain real property including the East Half of the Northwest Quarter of Section 20, (which is one-half of the land involved in this action). The pooling agreement did not include the West Half of the Northeast Quarter of Section 20, (the other one-half of the land involved in this action). The pooling agreement was executed by the persons

who then owned the royalty interests in the land in question. R. O. Nelson did not sign said agreement. The pooling agreement has not been changed or modified and the division of proceeds from production from the West Rainbow Bend Unit are now and have at all times since been divided among the interest owners in accordance with the agreement and the division order based thereon. A copy of the pooling agreement is attached hereto as Exhibit 'G' and made a part hereof. On May 1, 1956, the effective date of the pooling agreement, all production in the Unit came from the Bartlesville Sand. There is presently some production from the Layton Horizon on the (Thurlow) (Backus) lease(s), in addition to production from the Bartlesville Sand.

"10. On June 15, 1973, W. D. Short bought the working interest in the oil and gas leases included in the pooling agreement from the holders of such interests. The sale was expressly subject to the pooling agreement of the West Rainbow Bend Unit dated March 29, 1956. Since the sale, W. D. Short has been the operator of the oil and gas leases in the West Rainbow Bend Unit. A true copy of the assignment and bill of sale by Sun Oil Company (Delaware), et al, to W. D. Short and Marjorie O. Short, dated June 15, 1973, recorded July 24, 1973, in Book 192 of Leases at Page 482, is attached hereto as Exhibit 'H' and made a part hereof. W. D. Short and his wife, Marjorie O. Short, remain the sole owners of the working interest in the oil and gas leases included in the pooling agreement.

"11. On September 1, 1974, R. O. Nelson died testate. Under the terms of his will, title to the 160 acres now the subject of this quiet title action was assigned to his daughter, Dorothy Sheneman, and his son, Bobby L. Nelson, in equal shares.

"12. On November 10, 1977, Dorothy Sheneman Horton, formerly Dorothy Sheneman, Donald D. Horton, her husband, and Bobby L. Nelson, a single person, conveyed by warranty deed the said 160 acres to W. D. Short. W. D. Short obtained all interests the heirs of R. O. Nelson had in said real property.

"13. All production of oil from the 80 acres in the Wertman Lease in the West Rainbow Bend Unit ceased in 1966. All production of oil from the 80 acres in the Wertman Lease outside the West Rainbow Bend Unit had ceased, and the wells had been plugged, prior to November 10, 1977. W. D. Short acquired the working interest in the leases in the West Rainbow Bend Unit on June 15, 1973. On June 15, 1973, there was one injection well being used located on the 80 acres of the Wertman Lease within the unit. W. D. Short filed an application dated April 18, 1974, entitled 'Application for Fluid Repressuring and Water Flooding of Producing Formations' with the State Corporation Commission, for permission to equip and use a well for repressuring the Bartlesville Formation, said well located 990 feet from the North line and 1,650 feet from the West line of the Northwest Quarter of Section 20, Township 33 South, Range 3 East, Cowley County, Kansas. The application was granted and the well is being used at the present time to repressure the Bartlesville formation in the West Rainbow Bend Unit, of which one-half of the property in question is a part.

"14. There has been and continues to be production of oil from the Bartlesville Sand on the land encompassed by the West Rainbow Bend Unit other than the land in question in this action. Conoco Oil Company is purchasing all of the production from this pooling unit and, in addition to the defendants in this action, is paying some seventy odd persons and firms the net proceeds derived from the royalty interest therefrom."

Throughout this opinion the original oil and gas lease executed January 30, 1923, by Sarah Wertman, *et al.*, will be referred to as the "Wertman lease"; those parties claiming under the royalty conveyances executed in December, 1923, as the "Hoefer interests"; those parties claiming under the royalty reservation in the July 18, 1944, deed to R. O. Nelson as the "Wertman interests"; the East half of the Northwest quarter of Section 20 as the "Wertman west 80 acres"; and the West half of the Northeast quarter of Section 20 as the "Wertman east 80 acres." The West Rainbow Bend Unit includes the South half of the South half of the Southwest quarter of Section 17, and the Northwest quarter and the North half of the Southwest quarter of Section 20, all in Township 33 South, Range 3 East of the Sixth Principal Meridian, Cowley County, Kansas. The accompanying diagram, reproduced from the record, shows the location of the properties, leases and wells within the unit, along with the West half of the Northeast quarter of Section 20 lying outside the unit.

In considering this appeal, the unusual facts surrounding the ownership of the lessee's or working interest in the oil and gas leases and the fee title to the Wertman property must be kept in mind. Appellant became the lessee and operator of the four leases within the West Rainbow Bend Unit in 1973 and the fee owner of the Wertman property in 1977. It appears that he did not acquire the lessee's interest in the Wertman lease covering the Wertman east 80 acres. As pointed out in the stipulation of facts, the West Rainbow Bend Unit was created by a pooling agreement executed in 1956. At that time the Hoefer interests owned one-half of the royalty from the Wertman property and the Wertman interests owned one-half of the royalty from the Bartlesville sand of the Wertman property while R. O. Nelson owned the surface and oil and gas in place subject only to the Hoefer and Wertman royalty interests. The pooling agreement was executed by the holders of the Hoefer and Wertman interests and presumably by all interested owners, lessors and lessees of the other properties in the unit. R. O. Nelson, however, having no right at that time to any of the current production from the Wertman lease did not sign the pooling agreement. The record is silent whether Nelson refused to sign the pooling agreement or was just never asked to sign it. The trial court stated the positions of the parties as:

"The positions of the parties are apparent from the stipulation of facts and the documents attached. Plaintiff as owner of the fee contends that production has ceased upon any part of the 160 acre tract he purchased from the devisees of R. O. Nelson. The Wertman lease contained the familiar thereafter clause providing for continuation so long after the primary term as oil or gas or either of them should be produced from the land. The royalty interests conveyed to Hoefer and those reserved [by the Wertmans] in the Nelson deed have a similar limitation to the life of production, the difference being that the reservation in the Nelson deed has no definite or primary term and the royalty interest reserved is limited to oil produced from the Bartlesville formation. . . . Plaintiff argues that with the lapse of all production from the 160 acres involved by 1977, the royalty interests claimed by the defendants were extinguished according to the terms of the instruments by which they were created.

"Defendants claim continuation of the royalty interests, of course, and premise that claim upon the effect and operation of the pooling agreement. In their view, production extended the royalty interests according to the terms of the convey-ances and the reservation by deed, and the pooling agreement, under which production upon any pooled lease should be considered production upon all leases in the unit, is the means by which production has been continued as to the Wertman lease, although there is presently no producing well upon the Wertman

lease. Plaintiff counters that the pooling agreement was not signed by R. O. Nelson, at the time of its execution the owner of all mineral and royalty interests in the land except the one-half royalty conveyed to Hoefer and the royalty interest in the oil produced from the Bartlesville sand. As to the outstanding royalty interests, he [Nelson] held the reversionary interest to the oil and gas when the [royalty] interests should terminate. Plaintiff argues that because the Wertman lease did not authorize 'unitization,' the voluntary agreement on which defendants rely could not extend the lease unless all interest holders had joined.

. . . .

"The basic argument that plaintiff makes, much abbreviated, is that because at the effective date of the pooling agreement R. O. Nelson held one-half of the royalty interest in all formations except the Bartlesville sand and the entire reversionary interest under the Wertman lease, he had a 'significant bundle of rights' which could be modified only with his consent. . . .

"Defendants, on the other hand, argue that the lack of R. O. Nelson's signature on the pooling agreement is inconsequential. Because one-half of all oil and gas royalties had been conveyed away for a term of fifteen years and as long thereafter as oil or gas production continued at the time Nelson acquired his interest in 1944 and production had been obtained which perpetuated that interest, and because one-half of the royalty from production in the Bartlesville sand had been reserved by his grantors, and because there was production from the Bartlesville sand at the effective date of the pooling agreement, defendants assert that Nelson had no right to any of the production of oil from the property at the time the pooling agreement became effective. Production from four leases was being pooled, and he had no interest in any of it.

"The alignment of the parties on the effect of the failure of R. O. Nelson to sign the pooling agreement of March 29, 1956, defines the crux of the dispute as to the effect of the pooling agreement to continue the interests of the defendants in the subject property. Defendants' claims to royalty interests are founded upon continuation of production under the conveyances to Hoefer and the reservation in the deed to R. O. Nelson. Continuation of production for such purpose is premised upon the effect of the pooling agreement. It is contended that Nelson was not a necessary party and also that his consent to pooling is to be implied from his failure to object when the agreement went into effect. Plaintiff denies either express or implied consent to the agreement by his predecessor in title and argues that without consent to the agreement, production from the unit not on the Wertman acreage included therein could not extend the royalty interests of defendants. Plaintiff does not deny that production under the pooling agreement would extend the royalty interests if the owners of all mineral and royalty interests had joined.

"This issue can be further refined to a question of whether, in this instance, a determinable royalty interest can be pooled without the consent of the owner of the reversionary interest in the oil and gas in place. An additional and related question is whether the owners of royalty interests in a single horizon or formation from which production is being had can effectively pool their interests with the lessors of other oil and gas leases whose interests are not, so far as may be told from the agreement, limited to a single stratum."

The trial court in its scholarly and well-reasoned opinion

reviewed the Kansas cases on termination of determinable mineral and royalty interests as well as other authorities. The trial court held that the Wertman lease, and therefore the outstanding royalty interests, had not terminated and denied plaintiff's request to quiet his title to the property. The court was not only of the opinion that the pooling agreement, along with continued production from the unit, continued the Wertman lease in effect but that it would also be inequitable to grant plaintiff the relief requested. Under the facts of this case we do not deem it necessary or advisable to determine whether the holder of one hundred percent of the oil and gas royalty from a tract of land can enter into a pooling agreement, absent consent of the owners of the oil and gas in place, and thereby extend their term royalty interests beyond a cessation of production from the leased property when production continues on other property in the unit. We do agree with the trial court that under the circumstances and facts of the instant case, equity precluded the relief sought.

The 1956 pooling agreement provided:

"It is the intention of the parties that said pooled area shall be developed and operated as if said pooled area had been included in a single oil and gas lease. Said pooled area shall be developed and operated without respect to lease boundary lines, on a pooled basis, and LESSEES may drill, use and produce such wells as they deem advantageous to the pooled area, shut in such wells as they deem unnecessary or disadvantageous to the pooled area, use any wells that they select for injection purposes, acquire and inject salt or fresh water, or any other substances, and inject such substances, or any of them, in the pooled area at times, in quantities, at places within or without the pooled area, at pressures and under conditions that they may deem necessary or appropriate, and, in general, do all other things that they deem advisable to recover the oil, gas and other minerals from the pooled area and to conserve such production.

"B. All drilling, development and operations on the pooled area shall be considered for all purposes as drilling or operations on each of the pooled leases and production obtained from any pooled lease shall be considered for all purposes (except for determination of LESSORS' royalties) as production from each pooled lease and such production shall maintain all rights as to all minerals covered by said leases in force and effect in the same manner as if such production was from each such lease."

It is interesting to note that while the Wertman property within the unit constituted only approximately 28.5% of the acreage in the unit, that property was to receive 33.7% of the royalty. Evidently the royalty to be paid under the pooling agreement was based upon the relative production from the properties

placed in the unit rather than upon the more traditional acreage basis.

At the time of the assignment of the leases to plaintiff in 1973, they were owned by Sunray Mid-Continent Oil Company, Phillips Petroleum Company and Continental Oil Company. The record is not clear which lessee owned the Wertman lease at that time but it is clear that only that portion of the lease covering the Wertman west 80 acres was assigned to plaintiff. There is also nothing in the record to show that the portion of the lease on the east 80 acres has been released by the lessee, whichever it may be, and none of the three corporate lessees was named as a defendant in this action. The 1973 assignment of the leases to plaintiff provided:

"This Assignment and Bill of Sale is made subject to Pooling Agreement of West Rainbow Bend Unit dated March 29, 1956 . . . ."

It is clear from the documents and facts that plaintiff, the lessee and operator of the leases in the unit, tends to benefit from a failure to further produce the Bartlesville sand under the Wertman property if such failure constitutes a termination of the Wertman lease for non-production. Thus the lessee and operator of the unit, who is under a duty to operate and produce the property to the maximum benefit of both the lessors (in this case the royalty holders) and lessee tends to profit by a total cessation of production from the Wertman property in which he now owns the fee including the oil and gas in place or as some authorities say, the reversionary rights in the oil and gas after the termination of the Wertman lease.

Plaintiff's dilemma in attempting to wear two hats at the same time is borne out by his deposition testimony and the documentary evidence before the court. At the time he obtained the leases in 1973, the unit was producing approximately thirty to thirty-five barrels of oil per day and at the time of his deposition in March, 1981, the unit was still producing the same amount of oil. In April of 1974 the plaintiff filed with the Kansas Corporation Commission an "Application for Fluid Repressuring and Water Flooding of Producing Formations," seeking authority to continue to use a well on the Wertman west 80 acres. This well is still being used for the injection of approximately one thousand five hundred barrels of fluid per day. The application clearly states the well is "to be used in repressuring the lease or unit."

In addition, the tank batteries for holding the oil from all of the unit are located upon the Wertman west 80 acres. Plaintiff also conceded that if he prevailed in this action there was a possibility that he would do further exploration and seek additional production from the Wertman property. He further testified as follows:

"Q. Apparently there was a great deal of production because the pooling agreement indicates that one-third or over — a little over one-third of the ownership in the entire pool was attributed to the Wertman lease; am I correct about that?

"A. Yes.

"Q. What happens to this third of the interest in the pool in the event you prevail in this lawsuit?

"A. Goes to me if I prevail."

It is obvious from plaintiff's own testimony that as operator of the leases within the unit he has utilized and considered the Wertman west 80 acres as an integral and necessary part of the overall operation.

The trial court in its opinion stated:

"The action to quiet title originated in the courts of equity (65 Am. Jur. 2d, Quieting Title § 1), and the maxims of equity are applicable in suits to quiet title. (Id. § 59.) The fundamental principle that one who seeks equity must do equity applies in the quieting of title. (27 Am. Jur. 2d, Equity § 131.)

'The principle thus expressed governs the court in administering any kind of equitable relief in any controversy where its application may be necessary to work out complete justice. Having come into court seeking equitable relief, a complainant must offer to do equity as a condition to the granting of the remedy or relief sought. By appealing to the equitable jurisdiction, the complainant is deemed to have submitted himself to the court's decision as to what is necessary to do justice to the defendant as determined in the light of equitable principles.' (Id.)

The principle expressed in the maxim is applicable in the instant case. Plaintiff purchased the lessees' interests in the leases included in the unit subject to an agreement in which the expressed intent of the parties was to operate the pooled area as if it had been included in a single lease. Plaintiff cannot seek the equitable relief of divesting interests in the royalties from production from the Bartlesville formation when those interests were admittedly extant at his acquisition of the working interest in the pooled leases and were by the terms of the pooling agreement continued by production from any lease in the unit."

The court further stated:

"If pooling of the landowner's royalty interest in the Bartlesville production could not occur without the consent of R. O. Nelson, who had no present interest in the Bartlesville production royalties, he would have had the power of veto. If it were advantageous to the royalty interest owners to pool or utilize their interests

for secondary recovery operations, which are contemplated by the agreement in the reference to injection wells, and thus treat the formation as a single energy mechanism, they could have been thwarted by Nelson's refusal to join in an agreement which had no present benefit to him. Indeed, it might have been to his benefit to obstruct secondary recovery by this means. When production from the Bartlesville sand ended, he was, after all, the reversioner. In refusing to join the agreement, he would have been, in effect, exercising rights to the land-owner's interest in production from the Bartlesville formation which had clearly been granted to others.

. . . .

"The propositions defendants assert regarding the effect of the assignment of the lessee's interest and the meaning of 'subject to' cannot be quarreled with and no extensive analysis or citation of authorities is necessary. At the time of the assignment of the lessees' interest to plaintiff, plaintiff concedes the Wertman lease was in force by reason of production from the leasehold. There appears to be no argument that the duty of the lessee with regard to the royalty interests in the Bartlesville sand devolved upon plaintiff at that time by reason of the terms of the assignment. With the lessee's obligation and responsibility to the Bartlesville royalty interest owners to operate the Wertman lease, as well as all other leases in the unit, for the mutual benefit of lessors and lessees, it would be contrary to the policy of the law to say that the lessee might, upon acquisition of the reversionary interest in the Bartlesville stratum and the other mineral interests, simply obliterate the Bartlesville royalty interests by reliance upon termination of production when all reasonable efforts to secure and continue production were required of him in his capacity of lessee.

. . . .

"Treatment of the pooled acreage under several leases as a single oil and gas lease for all purposes is the legal and equitable right of all lessors under the pooling agreement. The correlative of that right is the duty of the lessee to honor the obligations of the pooling agreement through which consideration accrues to him. Plaintiff cannot seek the benefit of an equitable remedy and at the same time refuse to honor an obligation which equity would enforce."

## The trial court reached, *inter alia,* the following conclusions:

"D. Plaintiff acquired the working interest in all of the leases subject to the pooling agreement of March 29, 1956, and one of the terms of that agreement to which his interest was subject was that production from anywhere in the unit should be deemed production from all leases of the unit for all purposes except computing production shares. It would violate the terms and intent of the agreement and work a substantial inequity upon defendants here to permit plaintiff to repudiate the agreement by claiming termination of the Wertman lease by reason of lapse of production when he is both the operator-lessee who specifically assumed the obligation of producing the leases in the unit and the owner of the reversion in the Bartlesville formation on termination of the Wertman lease.

"E. It would be an intolerable inequity and contrary to the policy of upholding lawful agreements effecting unitization to promote conservation and efficient and economical recovery of oil and gas to permit plaintiff to divest defendants

here of their interest in production from the West Rainbow Bend Unit after many years of production for the benefit of all interest holders in the unit from the included Wertman acreage."

Based upon the unique factual situation, we concur in the trial court's judgment and its application of equitable principles in this case. See *Renensland v. Ellenberger,* 1 Kan. App. 2d 659, 665-666, 574 P.2d 217 (1977); *Hultz v. Taylor,* 163 Kan. 180, 181 P.2d 515 (1947).

In view of the decision reached herein, plaintiff's assertion of error in the trial court's refusal to allow an amendment of the pleadings to include some seventy owners, lessors and royalty owners of the other properties in the unit is moot. Likewise, we have concluded that plaintiff's alternative argument that the Hoefer and Wertman interests have terminated at least as to the Wertman east 80 acres is without merit.

The judgment is affirmed.

SCHROEDER, C.J., dissenting.