No. 120,068

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

THOROUGHBRED ASSOCIATES, L.L.C., *et al.*,
*Appellants/Cross-appellees*,

v.

KANSAS CITY ROYALTY COMPANY, L.L.C.;
ROBERT E. THOMAS REVOCABLE TRUST;
and D.D.H., L.L.C.,
*Appellees/Cross-appellants*.

SYLLABUS BY THE COURT

1.

Parties to an oil-and-gas lease can modify the terms of their agreement. Whether they have mutually agreed to do so is a factual question. Their agreement may be express or implied from their conduct.

2.

Parties to a contract can waive a condition; waiver requires intent and knowledge. Intent may be inferred from conduct, and knowledge may be actual or constructive. Whether a party has waived a contract term is a question of fact.

3.

Equitable estoppel is a judicial remedy in which a party is prevented from taking a position inconsistent with one it previously took. A party invoking equitable estoppel must prove three things: (1) a party's acts, representations, or silence when it had a duty to speak caused the invoking party to believe that certain facts existed; (2) that the invoking party reasonably relied and acted on that belief; and (3) that the reliance was detrimental to the invoking party.

4.

Under *Skelly Oil Co. v. Savage*, 202 Kan. 239, 447 P.2d 395 (1968), when parties operating under unitized gas leases incidentally produce other liquid hydrocarbons from a gas well, the gas lease may entitle them to royalties from the production of the non-gas hydrocarbons. But when the production of other hydrocarbons is not incidental to the gas production, the proceeds from it are not covered by the gas lease.

5.

K.S.A. 55-1617 provides that a prevailing party in a case to recover interest on certain oil-and-gas payments "may recover court costs and reasonable attorney fees at the discretion of the court." Under that provision, the award of costs and attorney fees is a discretionary call for the district court, not a mandated award.

Appeal from Comanche District Court; VAN Z. HAMPTON, judge. Opinion filed June 26, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Jeff Kennedy* and *Marcia A. Wood*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellants/cross-appellees.

*Matthew W. Brockman* and *David A. Elder*, of Hartzog Conger Cason, of Oklahoma City, Oklahoma, and *William J. Skepnek*, of The Skepnek Law Firm, P.A., of Lawrence, for appellees/cross-appellants.

Before LEBEN, P.J., POWELL and SCHROEDER, JJ.

LEBEN, J.: This case is the latest installment in a 17-year fight over revenue from gas leases organized into a single operating unit in Comanche County, Kansas. The fight centers on a simple issue: is a lease owned by the unit's former operator, Thoroughbred Associates, L.L.C. (Thoroughbred), included in the unit? If so, Kansas City Royalty

Company, L.L.C. (KC Royalty) and the other defendants are entitled to their share of profits from unit gas production.

In a prior appeal, the Kansas Supreme Court held that the plain language of the lease precluded its inclusion in the unit if only the lease terms were considered. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 308 P.3d 1238 (2013). But the court remanded the case to see if KC Royalty could show that the lease was unitized (made part of the single operating unit) under several alternative theories.

The district court ruled in KC Royalty's favor after a trial, and Thoroughbred filed this appeal challenging various aspects of the district court's conclusion that the parties had included the lease in the unit by modification, waiver, or equitable estoppel. KC Royalty cross-appealed, challenging the district court's decision not to award it attorney fees under K.S.A. 55-1617. We affirm the district court's conclusion that the lease is in the unit, but reverse its decision about the extent of KC Royalty's interest in the unit. We also affirm the district court's denial of attorney fees.

FACTUAL AND PROCEDURAL BACKGROUND

Our decades-long unitization saga begins with Thoroughbred president Robert Patton, who in 1997 started acquiring oil-and-gas leases from mineral owners in the Warmwater Prospect near Coldwater, Kansas. Those efforts paid off in December of that year when Thoroughbred successfully drilled the Bird Well, a prolific gas well that produced from the Mississippian rock formation.

To protect the Bird Well from competition, Thoroughbred acquired leases on the nearby property. It executed three leases with the mineral-rights owners of a 120-acre tract (the Tract) next to the Bird Well. After signing those leases, a 1/3 mineral interest in the Tract (or 40 mineral acres) owned by Oxy USA Inc. remained unleased.

3

*The Oxy Lease*

In July 1998, Thoroughbred contacted Oxy about selling its 1/3 interest in the Tract. Oxy drafted a lease (the Lease) using its standard form for Kansas wells; the parties signed the Lease on July 21 and later recorded it in the Comanche County deeds office.

Three features of the Lease stand out. First, Oxy granted Thoroughbred the power to unitize the Lease. That meant Thoroughbred could consolidate the Lease with others it owned in the area to form a single, joint operation. See Williams & Meyers, Manual of Oil and Gas Terms, p. 1191 (17th ed. 2018). If unitization occurred, Thoroughbred would own a working interest in the unit while Oxy and the other lessors would own a royalty interest. A working interest is the lessee's share of production after deducting royalty paid to the lessor; a royalty interest is a lessor's share (usually 1/8) of any oil and gas produced. *Mulsow v. Gerber Energy Corp.*, 237 Kan. 58, 61, 697 P.2d 1269 (1985). But Thoroughbred could include the Lease in a unit only if certain conditions existed. Those conditions do not affect the issues in this appeal.

Second, the Lease had a one-year primary term; it would expire in a year unless Thoroughbred had started drilling. If it had, the Lease continued for as long as Thoroughbred produced oil or gas in paying quantities from the Tract. And if Thoroughbred put the Lease in a unit, production from anywhere in the unit (not just the Tract) would extend the Lease because unit production was treated as if it had occurred on the Tract. Under what's called a Pugh clause, however, production from unitized lands would maintain the Lease "only to depths from the surface down to the deepest producing interval." In other words, the Lease would expire below the deepest depth drilled for gas production anywhere in the unit during the primary term.

4

Third, the Lease granted Oxy a 3/16 royalty on production from the Tract. Oxy would receive that same royalty on unit production based on its proportionate interest in the unit.

*The Rietzke Unit*

In fall 1998, production in the Warmwater Prospect heated up. In August, Thoroughbred drilled the Rietzke Well about 1,000 feet south of the Bird Well. In September, Thoroughbred recorded a Declaration of Unitization in the county deed office stating its intent to form a 640-acre unit (the Rietzke Unit) comprised of the "gas rights" in several listed leases. Thoroughbred also recorded an Affidavit of Commencement of Operations, which said that the drilling of the Rietzke Well had extended those leases beyond their primary terms. Both documents listed the Lease and the Tract as in the Unit.

In October, Thoroughbred prepared a document for the Unit called the Title Opinion. Title opinions state the extent of each lessor's mineral interest in a unit. Oil-and-gas operators like Thoroughbred provide these documents to purchasers so they know who to pay and in what amounts. Williams & Meyers, Manual of Oil and Gas Terms, p. 1160. The Title Opinion listed Oxy's royalty interest as in the Unit, and it described the Declaration as having "unitized the [listed] leases."

Thoroughbred drilled five successful wells in the Unit, none of which were located on the Tract covered by the Lease. These wells produced oil and gas from different rock formations found at different depths beneath Earth's surface. From shallowest to deepest, these formations were the Lansing, Kansas City, Marmaton, Altamont, Mississippian, and Viola. Some wells produced from one formation, while others produced from several:

5

| Well | Drill Date | Formations & Substances |
|---|---|---|
| Rietzke | August 1998 | Mississippian (gas) Altamont (gas) Lansing-KC (gas) |
| Jamie | August 1999 | Mississippian (gas) |
| Husker | January 2001 | Viola (oil, gas) Mississippian (gas) |
| Blackshirt | September 2001 | Viola (oil, gas) Altamont (gas) |
| Tunnelwalk | December 2001 | Viola (oil, gas) Mississippian (gas) |

Thoroughbred also drilled two dry holes in the Unit that didn't produce oil or gas in paying quantities: the Big Red Well, drilled in October 2001, and the Craig Bohl Well, drilled a month later.

*The sale to KC Royalty*

For several months after Thoroughbred formed the Unit, it sent Oxy drilling information, production reports, and royalty payments for the Rietzke Well. Oxy also signed a division order for that well. Thoroughbred had the lessors sign an order for each new well that stated their agreement to receive the share of production listed in the Title Opinion. Thoroughbred then provided the orders to buyers.

In June 1999, Oxy sold its interest in the Lease to KC Royalty and another entity whose interest Robert E. Thomas Revocable Trust and D.D.H., L.L.C. later acquired. For simplicity, we'll refer to these three entities collectively as KC Royalty.

In a letter notifying Thoroughbred of the sale, KC Royalty ratified any division orders Oxy had signed and asked Thoroughbred to start sending royalty payments to KC Royalty. Thoroughbred sent KC Royalty its first royalty check on June 30, 1999, for May

6

production from the Rietzke Well. And in November, KC Royalty signed a division order from Thoroughbred for the Jamie Well that listed KC Royalty's royalty interest in the Unit. KC Royalty continued to receive royalty payments for two and a half years; Thoroughbred cut a final check to KC Royalty in December 2001.

*The business relationship sours*

Early on in their relationship, KC Royalty's managing partner, Robert Blair, sent Patton several letters about whether the Bird Well was draining the Rietzke Well. Drainage occurs when a deeper producing well reduces pressure in a reservoir, causing the oil or gas to migrate. Williams & Meyers, Manual of Oil and Gas Terms, p. 307. The Bird Well, located just outside the Unit and about 1,000 feet north of the Rietzke Well, was producing gas from the Mississippian. That formation is below the Altamont, where the Rietzke Well produced at the time. Believing that the Bird Well was draining the Mississippian, Blair asked Patton to drill an offset well in the Unit that would produce from that formation. Patton denied that drainage was occurring but was open to drilling an offset well. KC Royalty could have drilled its own offset well without Thoroughbred's permission if the Lease was not in the Unit.

Another dispute arose in October 2001, this time over whether KC Royalty would participate in the Big Red Well that Thoroughbred planned to drill on the Tract to test Viola production. In a letter about the issue, Blair disputed Patton's recent assertion in a phone call that the Lease was still effective in the Mississippian, which is above the Viola. Patton said that if KC Royalty participated in the Big Red Well, it would have to pay for its proportionate share of drilling costs in the Viola but not for any costs above the Viola. They didn't reach an agreement, so Thoroughbred drilled the Big Red Well without KC Royalty's participation.

7

On November 6, 2001, Thoroughbred filed two intent-to-drill notices for Viola wells on the Tract. Thoroughbred never drilled the wells, but filing the notices prevented anyone else from drilling at the proposed sites for one year unless Thoroughbred consented. One of the notices covered KC Royalty's preferred location for a new well it planned to drill on the Tract and near the Bird Well. Instead, KC Royalty had to drill further away from the Bird Well and could only do so after Thoroughbred agreed. Blair thought Thoroughbred filed the notices to "buy time" so it could drain the Mississippian and Viola without competition. KC Royalty drilled the well in 2002; as of 2017, production revenue had yet to exceed drilling costs.

In a November 28, 2001 letter to Blair, Patton clarified Thoroughbred's stance on the Lease's status. Blair had asked why Thoroughbred didn't ask KC Royalty to participate in the Craig Bohl Well, a Viola test well. Patton said that Thoroughbred had not proposed any of the Unit's Viola wells, other than the Big Red Well drilled on the Tract, because the Lease's Viola rights had expired and were "no longer included in the [U]nit." The only rights "still included in the [U]nit," he said, were those that were still valid under the Lease. Blair responded that the Lease had not expired in Viola.

In a letter to Patton on New Year's Day, KC Royalty's attorney repeated that claim and demanded that Thoroughbred pay any unpaid royalties from Viola-producing wells. Thoroughbred's attorney, John Pike, responded on January 10, stating that there had been no Tract production or "unitized gas production" in the Viola. Although some wells had produced in the Viola, they produced oil and associated casinghead gas in which KC Royalty didn't own an interest. On March 28, Pike sent another letter that brought up the unitization conditions in the Lease that we mentioned earlier. To understand that letter, we need to briefly jump back a few months.

Back in July or August 2001, Patton had asked an investor named Steve Dillard to review the Lease. When Patton did so, he told Dillard that KC Royalty had been

8

requesting well data and complaining about Thoroughbred's operations; Dillard thought that it was odd for Patton to share this information with him. Then in August or September, Patton again asked Dillard to review the Lease. This time, Dillard discovered the conditions that only allowed unitization if certain conditions existed. A few days later, Dillard, Pike, and Patton met to discuss the issue. They concluded that because the conditions didn't exist when Thoroughbred had formed the Unit by filing the Declaration, the Lease should not have been included in the Unit.

Fast forward to Pike's March 28 letter, which asserted that the conditions precluded the Lease from ever being included in the Unit. Unless KC Royalty agreed to waive the conditions and maintain current unitization in the Altamont, Pike said, Thoroughbred would drop the Lease from the Unit and request repayment of royalties. If KC Royalty signed an amended unit declaration, he said that Thoroughbred would release the Lease for all other formations.

Rather than respond to Pike's letter, KC Royalty filed several contract claims against Thoroughbred in federal court on July 1, 2002. A federal judge dismissed that case a few years later because KC Royalty failed to join indispensable parties. *Kansas City Royalty Co., L.L.C. v. Thoroughbred Assocs., L.L.C.*, 215 F.R.D. 628, 633-34, 637 (D. Kan. 2003).

*The first appeal*

In September 2002, Thoroughbred filed this case against KC Royalty in state court in Comanche County. Thoroughbred asked the district court to declare that the Lease conditions precluded unitization, amend the Declaration to delete the Lease from the list of unitized leases, and require KC Royalty to repay all royalties it received for unit production. In response, KC Royalty argued that Thoroughbred's claims were barred by waiver, estoppel, and ratification. KC Royalty also filed two counterclaims of note: one

9

for drainage and one for breach of the Lease and the Declaration for not paying KC Royalty its share of royalty form unit production.

Both parties moved for summary judgment in 2007. Thoroughbred argued that the conditions in the Lease precluded its inclusion in the Unit because they were not met when the Declaration was filed. KC Royalty countered that the conditions were ambiguous, and that the parties had agreed to allow unitization after filing the Declaration.

The district court granted KC Royalty's motion and denied Thoroughbred's. Holding that the Lease remained in effect from the surface down to the base of the Marmaton-Altamont interval (the dividing line between the formations), the district court split KC Royalty's interest above and below that line. Above the interval, where the Lease remained effective, KC Royalty had a 0.01171875 royalty interest in the Unit's production (40 mineral acres out of the 640-acre unit, multiplied by a 3/16 royalty). Below the interval, where the Lease had expired, the court assigned KC Royalty a 0.0625 working interest in the Unit (40 out of 640 acres, times an 8/8 working interest). Based on these figures, the district court entered a $597,420.95 judgment for KC Royalty that included prejudgment interest and attorney fees.

After a bench trial on KC Royalty's drainage counterclaim a year later, both parties appealed the summary-judgment decision to our court. Thoroughbred argued three relevant points: (1) the conditions in the Lease precluded unitization; (2) the district court erred in assigning KC Royalty a working interest in the Unit below the Marmaton-Altamont interval; and (3) if the Lease was in the Unit, KC Royalty's interest is limited to gas production and doesn't include oil production as the district court had found. Among other things, KC Royalty appealed the district court's decision on attorney fees. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 45 Kan. App. 2d 312, 315-16, 248 P.3d 758 (2011).

10

Our court affirmed the district court on every issue. Because Oxy and Thoroughbred had intended to unitize the Lease but were mutually mistaken about the conditions, we reformed the Lease to include it in the Unit. 45 Kan. App. 2d at 324-25. We also affirmed the district court's finding that KC Royalty had a 0.0625 working interest in the Unit below the Marmaton-Altamont interval. That was the case, we explained, because the Lease had expired below that level when no production occurred during the primary term. So KC Royalty's royalty interest in the lower formations became an unleased working interest. 45 Kan. App. 2d at 325-26.

And we affirmed the district court's finding that KC Royalty's unit interest included all production, not just gas. 45 Kan. App. 2d at 326-27. The Declaration unitized the "gas rights" in the listed leases, which under *Skelly Oil Co. v. Savage*, 202 Kan. 239, 249, 447 P.2d 395 (1968), included liquid hydrocarbons produced as "incidental byproducts" of the gas. 45 Kan. App. 2d at 326-27. We held that KC Royalty's interest extended to all production, not just gas. 45 Kan. App. 2d at 326-27.

The Kansas Supreme Court agreed to review our decision on several issues, including whether the Lease's conditions precluded unitization. The court held that the Lease unambiguously precluded unitization unless the conditions occurred. Because they didn't occur before the Declaration was filed, Thoroughbred had no authority under the Lease itself to include the Lease in the Unit. *Thoroughbred*, 297 Kan. at 1207-09.

Next, the Supreme Court considered KC Royalty's alternative theories for unitizing the Lease despite its clear language. For example, KC Royalty had argued in the district court that the parties modified or waived the conditions. The Supreme Court couldn't tell from the record whether KC Royalty could succeed on these alternative unitization theories, so it remanded the case for the district court to consider them. 297 Kan. at 1209-11.

11

To guide the district court's consideration, the Supreme Court commented on issues that would arise if an alternative theory supported unitization. It noted that Thoroughbred had not sought review of the panel's finding that KC Royalty had a working interest in the Unit below the Marmaton-Altamont interval, so that finding would become law of the case if the Lease was in the Unit. 297 Kan. at 1211-12.

The Kansas Supreme Court also commented on whether KC Royalty's interest in the Unit would include all production or only gas. Unable to discern from the record whether the *Skelly* case applied, the court reversed our finding that KC Royalty's interest included all non-gas production. *Thoroughbred*, 297 Kan. at 1212-13. Then it gave three questions for the district court to answer on remand if the issue arose: (1) did the Declaration create a gas unit; (2) if so, how did the parties define the "gas rights" included in the Unit; and (3) did the oil produced in the Unit meet that definition? 297 Kan. at 1213.

To recap, the Supreme Court found that the conditions in the Lease precluded unitization but remanded for the district court to consider KC Royalty's alternative arguments for including the Lease in the Unit. 297 Kan. at 1214-15.

*The second appeal*

On remand, the district court denied both parties' summary-judgment motions on the alternative unitization theories. In doing so, the court found that KC Royalty's mutual-mistake defense was barred by the five-year statute of limitations. The rest of the alternative claims were set for trial. At trial, the court heard testimony from Patton, Dillard, Blair, and a lessor in the Unit.

The district court decided all the alternative claims in KC Royalty's favor. The court found that the parties had agreed to unitize the Lease after the Declaration had been filed, that KC Royalty had waived the conditions, and that Thoroughbred was equitably estopped from enforcing them. Because the Lease was in the Unit, KC Royalty had a 0.01171875 royalty interest above the Marmaton-Altamont interval and a 0.0625 working interest below that level. KC Royalty's interest, the court explained, extended to all liquid hydrocarbons produced in the Unit. Under *Skelly*, the court determined that the "gas rights" unitized by the Declaration covered certain liquid substances produced as byproducts of the gas. Because all liquids produced in the Unit were incidental byproducts of the gas, the court concluded that KC Royalty's interest included all unit production. The court entered a $739,389.85 judgment for KC Royalty.

Thoroughbred appealed, and KC Royalty cross-appealed the district court's decision to deny KC Royalty attorney fees as the prevailing party under K.S.A. 55-1617.

ANALYSIS

Thoroughbred raises three issues on appeal. The first involves KC Royalty's three alternative theories for including the Lease in the Unit: modification, waiver, and equitable estoppel. The district court found for KC Royalty on each, and Thoroughbred says the evidence didn't support those findings. Next, Thoroughbred challenges the finding that KC Royalty has a working interest below the Marmaton-Altamont interval. Last, Thoroughbred appeals the district court's finding that, under *Skelly*, KC Royalty has an interest in all liquid hydrocarbons produced in the Unit. After addressing these issues, we turn to KC Royalty's cross-appeal on attorney fees.

13

I. *Thoroughbred Has Not Shown Error in the District Court's Conclusion that the Parties Included the Lease in the Unit by Modification, Waiver, or Estoppel.*

Thoroughbred argues that the district court erred in finding that the parties included the Lease in the Unit by modification, waiver, or equitable estoppel. Success on that argument is no easy task: Thoroughbred must disprove all three theories to avoid the Lease's inclusion in the Unit. To know whether Thoroughbred can do so, we need to know what standard of review applies.

Thoroughbred invokes two different review standards in its brief. The first applies when we review the district court's findings at a bench trial. Under that standard, we exercise unlimited review of the district court's legal conclusions and review its factual findings for substantial evidence. Substantial evidence is legal and relevant evidence that a reasonable person might accept as supporting a conclusion. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

The second standard Thoroughbred invokes applies when we review a ruling on a summary-judgment motion. The problem with applying that standard, however, is that a trial occurred. If a case goes to trial after both parties' summary-judgment motions were denied, a party seeking to appeal that decision must preserve its objection. It can do so by following Thoroughbred's lead: incorporate the summary-judgment arguments into a posttrial motion for judgment as a matter of law. If the district court denies *that* motion, as the district court did here, that denial can be appealed rather than the earlier summary-judgment motion. *Ortiz v. Jordan*, 562 U.S. 180, 184, 131 S. Ct. 884, 178 L. Ed. 2d 703 (2011); *Evergreen Recycle v. Indiana Lumbermens Mut. Ins. Co.*, 51 Kan. App. 2d 459, 490, 350 P.3d 1091 (2015). Because Thoroughbred has not appealed the denial of its posttrial motion, the bench-trial standard applies. Having established the correct standard of review, we now address the evidence supporting each of KC Royalty's alternative unitization theories.

*Modification*

Parties to an oil-and-gas lease, like parties to any contract, can modify the terms of their agreement. *Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, Syl. ¶ 10, 292 P.3d 289 (2013). But one party cannot unilaterally do so; both must agree to the change. Their agreement may be express or implied from their conduct. *Fast v. Kahan*, 206 Kan. 682, Syl. ¶ 3, 481 P.2d 958 (1971). In any case, whether they have modified a contract term is a factual question. *Thoroughbred*, 297 Kan. 1193, Syl. ¶ 7.

The district court found that the parties agreed to modify the Lease and include it in the Unit after the Declaration was filed. Thoroughbred says that finding wasn't supported by facts or law. We disagree. After reviewing the substantial evidence that supported the district court's modification finding, we assess Thoroughbred's three principal objections to that evidence: (1) that it showed mutual mistake, not modification; (2) that KC Royalty's refusal to waive the conditions in March 2002 negates a modification finding; and (3) that the district court improperly relied on evidence of intent during the Lease negotiations. We address other arguments as they arise when discussing specific modification evidence.

Let's start with Thoroughbred. It expressed an intent to unitize in three documents filed after the parties signed the Lease: (1) the Declaration of Unitization, (2) the Affidavit of Commencement of Operations, and (3) the Title Opinion.

The Declaration said that Thoroughbred was forming a unit made up of the leases and land listed in that document. The list included the Lease despite the unmet conditions that otherwise precluded unitization. Citing a dictionary definition, Thoroughbred contends that the Declaration can't support modification because it's not an agreement; a declaration is a "formal statement, proclamation, or announcement." Black's Law

15

Dictionary 512 (11th ed. 2019). But what the Declaration formally stated, proclaimed, or announced was Thoroughbred's "purpose to unitize" the listed leases. So even if the Declaration isn't an agreement, it is evidence of Thoroughbred's intent to include the Lease in the Unit.

So is the Affidavit, which Thoroughbred filed to comply with K.S.A. 55-205. That statute requires lease owners to notify the public when an event occurs that extends a lease beyond its primary term. The Affidavit said that such an event had occurred—the drilling of the Rietzke Well—for all the leases listed in the document, including the Lease. Remember that the Rietzke Well was in the Unit but not on the Tract. So the only way that drilling that well would trigger K.S.A. 55-205's filing requirement would be if the Lease had been in the Unit. Thus, the Affidavit was more evidence of Thoroughbred's belief that unitization had occurred.

The Title Opinion was even more evidence. As we explained earlier, a title opinion is a document the lessee provides to buyers that states the extent of each lessor's mineral interest; it lets buyers know who to pay and in what amounts. Williams & Meyers, Manual of Oil and Gas Terms, p.1160. Thoroughbred's Title Opinion listed Oxy's interest under the Lease as in the Unit, just as the Affidavit and Declaration had. All three documents provide more than enough evidence of Thoroughbred's intent to unitize the Lease.

Of course, Thoroughbred could not unilaterally do so. It takes two to modify, so Oxy or KC Royalty must have also intended to include the Lease in the Unit. Substantial evidence supported a finding that both did.

Oxy first expressed its intent to unitize by not objecting to the documents Thoroughbred filed that included the Lease in the Unit. Thoroughbred's actions conflicted with the Lease's terms, which precluded unitization unless the conditions existed. Oxy's

16

silence in response to performance that deviated from the Lease terms was some evidence of its intent to modify the Lease and allow unitization. We recognize, however, that silence alone is insufficient; there must also be "other circumstances tending to show an intention to . . . derogate from" the Lease's terms. *Owens v. City of Bartlett*, 215 Kan. 840, Syl. ¶¶ 5-6, 528 P.2d 1235 (1974). But Oxy did much more than remain silent about its interest being listed as unitized.

Oxy expressed its intent again when it signed a division order for the Rietzke Well. Thoroughbred sent the Unit lessors a division order for each new well to confirm their interest. As Dillard testified at trial, signing an order meant that the lessor "agree[d] to accept that amount of revenue." By signing the Rietzke Well order, Oxy agreed to accept payment for Unit production in the amount listed. Oxy did so despite the Lease language that precluded unitization. Thoroughbred would not have sent that order unless it thought the Lease was in the Unit, and Oxy would not have signed it unless it thought the same.

KC Royalty signed division orders too. KC Royalty ratified the Rietzke Well order after buying the Lease from Oxy, an act Blair viewed as confirming that the Lease was in the Unit. A few months later, KC Royalty signed an order for the Jamie Well that likewise listed the Lease's interest as unitized; the order said that KC Royalty "certif[ied] and warrant[ed] to Thoroughbred . . . that [it was] the legal owner[] of the interest" in the Unit listed in the order. As Dillard put it at trial, Kansas was "acknowledg[ing] what [its] interest was in the unit." Like the Rietzke Well, the Jamie Well wasn't on the Tract, so there would have been no reason for Thoroughbred to send or for KC Royalty to sign the order unless both parties understood that the Lease was in the Unit.

Any doubt about Oxy or KC Royalty's intent was resolved when both started accepting royalty for unit production. Although never deciding the issue explicitly, our Supreme Court has noted the possibility that accepting royalty payments could

17

independently establish a unitization agreement. See *Thoroughbred*, 297 Kan. at 1209-10; *Klippel v. Beinar*, 222 Kan. 681, 686, 567 P.2d 867 (1977). Courts from other states have reached that conclusion. E.g., *Beck v. Wight*, 116 Mont. 345, 151 P.2d 1014, 1015-16 (1944); *Westbrook v. Atlantic Richfield Company*, 502 S.W.2d 551, 558 (Tex. 1973).

Following their lead, we conclude that Oxy, and later KC Royalty, agreed to unitization by accepting royalty payments. The only difference between the cases just cited and this one is that here the lessee is the party seeking to avoid unitization. Thoroughbred offers no reason why that distinction matters. The important point is that Thoroughbred sent royalty checks for Unit production for 30 months, first to Oxy and then to KC Royalty. None of those were for Tract production; each was for Unit production from non-Tract wells. By sending and accepting royalty payments for more than two years, Thoroughbred and KC Royalty mutually assented to include the Lease in the Unit.

Against the abundance of evidence supporting modification, Thoroughbred offers three responses. First, Thoroughbred says these documents really show mutual mistake, not modification. That could be significant because KC Royalty failed to raise mutual mistake—an affirmative defense that must be timely raised in the answer—when it answered the petition. Thoroughbred argues that the parties didn't realize the conditions existed, not that they intended to unitize the Lease despite the conditions.

If that were true, contracting parties could never modify a term without subjective knowledge of its existence. Yet we know that's not the case because Kansas courts recognize implied modification, a doctrine rooted in the objective intent conveyed by the parties' actions. See *Fast*, 206 Kan. 682, Syl. ¶ 3. Indeed, contractual intent is always measured by an objective standard. *O'Neill v. Herrington*, 49 Kan. App. 2d 896, Syl. ¶¶ 8-10, 317 P.3d 139 (2014). So even if the parties were unaware that the conditions existed, they could still manifest their intent to unitize the Lease by objective conduct

18

conveying that intent. The substantial evidence discussed above shows that's exactly what they did. In a given case, a set of facts might show both mutual mistake and modification. Here, the district court found modification, and there's ample evidence to support that conclusion.

Second, Thoroughbred argues that KC Royalty couldn't have agreed to modify the Lease because it rejected a request in March 2002 letter to waive the conditions. But by then, the parties had already modified the Lease. They'd been paying and accepting royalties for 30 months; Thoroughbred had filed the Declaration, the Affidavit, and the Title Opinion listing the Lease as in the Unit; and Oxy and KC Royalty had signed division orders agreeing to accept their interest in the Unit for royalty payments. Because all the actions expressing the parties' mutual assent to include the Lease in the Unit occurred before Thoroughbred's waiver request, KC Royalty's response to that request doesn't negate a finding of modification.

Last, Thoroughbred objects to the district court's reliance on evidence about Thoroughbred and Oxy's intent to unitize the Lease when they negotiated the document. That pre-contract formation evidence can't support modification, Thoroughbred asserts, because modification is a later agreement shown by the parties' intent after they formed the original contract. See *Coonrod & Walz Constr. Co., Inc. v. Motel Enterprises, Inc., et al.*, 217 Kan. 63, Syl. ¶ 1, 535 P.2d 971 (1975).

While pre-Lease statements can't independently show modification, the district court properly considered them because they helped explain Thoroughbred's conduct after recording the Lease. And as explained at length above, the district court cited plenty of other evidence of modification besides pre-Lease statements. So even if the district court had improperly considered statements of Thoroughbred and Oxy's intent during negotiations, we would still find no error in the district court's conclusion that the Lease was modified.

19

In short, the parties modified the Lease to include it in the Unit. Oxy and Thoroughbred's conduct after signing the Lease shows a consistent intent to unitize, which continued after KC Royalty acquired the Lease. We affirm the district court's modification finding because it was supported by substantial evidence. As we noted earlier, that finding alone means that the Lease is in the Unit and KC Royalty is entitled to some interest in the Unit. But even if there were some legal problem with the district court's modification decision, KC Royalty could still prevail on waiver or equitable estoppel. So we will proceed to examine those bases for including the Lease in the Unit.

*Waiver*

Unlike modification, which requires mutual assent, waiver can occur unilaterally. 13 Williston on Contracts § 39:24 (4th ed.). To waive a condition, two elements must exist: intent and knowledge. Intent may be inferred from the waiving party's conduct, and knowledge may be actual or constructive. *Flott v. Wenger Mixer Manufacturing Co.*, 189 Kan. 80, 90, 367 P.2d 44 (1961). As with modification, whether a party has waived a contract term is a question of fact. *Thoroughbred*, 297 Kan. 1193, Syl. ¶ 7.

Our waiver analysis centers on Oxy and KC Royalty because, as the district court found and Thoroughbred doesn't contest on appeal, the conditions benefited those parties by favoring production on the Tract over unitization. So Oxy and KC Royalty had the unilateral power to waive the conditions and allow Thoroughbred to include the Lease in the Unit.

Thoroughbred challenges the district court's findings on both intent and knowledge. On both elements, Thoroughbred's arguments (and our response to them) will sound familiar because they are much the same as the ones Thoroughbred made on modification.

20

On intent, Thoroughbred says KC Royalty couldn't have waived the conditions because it rejected a request from Pike in March 2002 to do just that. But Blair testified that KC Royalty didn't agree to Pike's request because KC Royalty considered the Lease to be in the Unit. If KC Royalty had waived the conditions by March 2002, then it doesn't matter that KC Royalty rejected Thoroughbred's offer to reinstate them (just as it didn't affect the modification analysis earlier). The question, then, is whether substantial evidence supports a finding that KC Royalty waived the conditions before March 2002.

The parties address that question as the district court did, with a slew of implied-waiver cases. Boiled down, those cases stand for a simple proposition: one can infer a party's intent to waive a contractual right from conduct inconsistent with an intent to exercise the right. E.g., *Owens*, 215 Kan. at 844-45 (concluding that a city waived a requirement that it approve a contractor's extra work in writing by consistently ordering extra work orally and paying for it).

Consider *Kenoyer v. Magnolia Petroleum Co.*, 173 Kan. 183, 245 P.2d 176 (1952). There, a lessor claimed that a lease covering two tracts allowed unitization only if the lessee included both tracts in the same unit. Even if the same-unit condition existed, our Supreme Court found that the lessor had waived it—and "any right he may have had to compel the inclusion of both tracts in one unit"—by executing a written agreement with the lessor that unitized only one tract. 173 Kan. at 187. By acting inconsistently with an intent to exercise the condition, the lessor had waived it.

So too here. All the evidence that supports Oxy and KC Royalty's intent to modify the Lease also supports their intent to waive the conditions. After Thoroughbred filed the Declaration and Affidavit listing the Lease in the Unit, Oxy accepted royalty payments and received production information for the Rietzke Well. Oxy would not have taken those actions had it intended to enforce the conditions, which prioritized Tract production

21

over unitization, because the Rietzke Well was not on the Tract. Nor would it have signed a division order for that well that confirmed its interest in the Unit. And KC Royalty would not have ratified that order, signed another order for the Jamie Well, or continued accepting royalty payments from unit production for 30 months. All these actions occurred before Pike requested a waiver in March 2002; none of these actions would make sense if Oxy or KC Royalty had intended to enforce the conditions. We have no trouble concluding that substantial evidence supported the intent element of waiver.

On the knowledge element, Thoroughbred makes the same point as it did on modification: KC Royalty couldn't have waived the conditions because it didn't know they existed. But KC Royalty could waive the conditions if it had actual *or* constructive knowledge of them. See *Flott*, 189 Kan. at 90. KC Royalty had constructive knowledge of the conditions: as a party to the Lease, it was charged with knowledge of its terms. Once it bought the Lease, KC Royalty became bound by the Lease's terms even if it didn't read or understand them. See *Albers v. Nelson*, 248 Kan. 575, Syl. ¶¶ 3-4, 809 P.2d 1194 (1991).

This general rule doesn't apply, of course, if the parties entered the contract by mutual mistake. 248 Kan. 575, Syl. ¶ 4. But the potential mistake here was in the Lease's performance, not in its formation. So the general rule applies here: Oxy had a duty to read the Lease and understand its terms, a duty that KC Royalty assumed when it acquired the Lease. Because KC Royalty had constructive knowledge of the conditions, the second element of waiver is also met.

In sum, substantial evidence supported the district court's conclusion that Oxy and KC Royalty waived the unitization conditions. Their conduct consistently showed an intent to include the Lease in the Unit and to not enforce the conditions. And their duty to read the Lease meant that they had constructive knowledge that the conditions existed. So even if modification could not support unitization, waiver would. Moreover, even if

22

Thoroughbred could defeat both modification and waiver, it would still have one more unitization theory to disprove—equitable estoppel.

*Equitable Estoppel*

Equitable estoppel is a judicial remedy whose application turns on the facts of each case. *Steckline Communications, Inc. v. Journal Broadcast Group of KS, Inc.*, 305 Kan. 761, Syl. ¶ 4, 388 P.3d 84 (2017). In deciding whether equitable estoppel applies, one must consider the policy it advances: preventing the unconscionable result that arises when a person "'maintain[s] a position inconsistent with one in which he or she accepted a benefit.'" 305 Kan. at 770. The party invoking equitable estoppel must prove three elements: (1) another party's acts, representations, or silence when it had a duty to speak caused the other party to believe that certain facts existed; (2) that other party reasonably relied and acted on that belief; and (3) the reliance was detrimental. 305 Kan. 761, Syl. ¶ 3; see *Doe v. Popravak*, 55 Kan. App. 2d 1, Syl. ¶ 10, 421 P.3d 760 (2017).

Before turning to whether KC Royalty proved those elements, we must analyze Thoroughbred's contention that only lessees (not lessors) may claim that a lease was unitized by estoppel. It's true that in both cases cited by the Kansas Supreme Court in the prior appeal, a lessee invoked equitable estoppel against a lessor who denied that unitization had occurred. See *Thoroughbred*, 297 Kan. at 1210. But the fact that no unitization case has yet applied equitable estoppel against a lessee is no reason to not apply it here—the principles behind equitable estoppel either apply or they don't: a lessor to any other type of lease would have no problem invoking equitable estoppel against a lessee. We find no reason why an oil-and-gas lease should be treated differently.

Besides, Thoroughbred's per se rule against lessor unitization-by-estoppel claims advances a formulaic approach to equitable estoppel that our Supreme Court has cautioned against. *Steckline*, 305 Kan. at 770. Adopting such a rule would undermine the

23

flexible, case-by-case approach that's "'a hallmark of the doctrine.'" 305 Kan. at 770. If a lessee benefits from claiming that a lease was unitized but later reneges on that claim, then a lessor may raise the same argument that the lessee could raise if the roles were reversed—that letting the other party maintain its inconsistent positions would be unconscionable.

We next consider whether substantial evidence supported the elements of equitable estoppel here. Proof of the first element required a showing that Thoroughbred's acts, representations, or silence under a duty to speak induced KC Royalty to believe that the Lease was in the Unit. 305 Kan. 761, Syl. ¶ 3.

Thoroughbred maintains that no evidence shows that it ever represented to Oxy or KC Royalty that the Lease was in the Unit. Instead, Thoroughbred says it acted in good faith to remove KC Royalty once it discovered the conditions. Keeping an improperly unitized lease in the Unit, Thoroughbred explains, would have violated its duty to maximize the profit of the other lessors. See *Short v. Cline*, 234 Kan. 670, 678, 676 P.2d 76 (1984). By acting in good faith to fulfill this duty, Thoroughbred contends that it couldn't have made misrepresentations to KC Royalty.

Even if such a duty exists, no evidence supports the claim that Thoroughbred was acting to fulfill it. The undisputed evidence at trial was that Thoroughbred concluded that the conditions precluded unitization in August or September 2001, but it didn't inform KC Royalty of that conclusion until March 28, 2002. During that six-month delay, Thoroughbred kept sending KC Royalty payments for unit production and sending letters stating that the Lease was still active down to the Mississippian (which would only be the case if the Lease had been unitized). No Tract production occurred within the Lease's primary term, so the only way that statement could be true was if Thoroughbred thought that unit production had extended the Lease. These actions conflicted with the good-faith-operator duty Thoroughbred claims it exercised.

24

Many other actions also supported the district court's findings on the first estoppel element. By now, we sound like a broken record in repeating them: Thoroughbred recorded documents listing the Lease as in the Unit, sent division orders for unit wells that listed the Lease's interest, and paid KC Royalty on unit production for 30 months.

All of that presents a classic case in support of the first element of equitable estoppel. After representing that the Lease was in the Unit for over three years, Thoroughbred claimed that the Unit never included the Lease because of the unmet conditions. Flip-flops like that are precisely the kind of inconsistency that equitable estoppel protects against. See *Steckline*, 305 Kan. at 770.

The second element is reasonable reliance. Thoroughbred says KC Royalty cannot show it because Oxy drafted the Lease. Put another way, Thoroughbred contends that KC Royalty has shown only that it relied on Oxy's representations that the Lease was unitized, not Thoroughbred's. That misstates KC Royalty's estoppel claim, which is based on Thoroughbred's actions. During sale negotiations, Oxy provided KC Royalty with documents from Thoroughbred about the Unit's operations, including a division order and production information. Blair testified that these materials informed KC Royalty's belief that the Lease was in the Unit and its decision to buy the Lease. Oxy may have been the one relaying that information to KC Royalty, but the source was Thoroughbred.

And even if Thoroughbred's pre-sale representations didn't support reliance, its post-sale representations do. Within a month of the sale, Thoroughbred sent KC Royalty its first of 30 royalty checks for unit production. A short time later, Thoroughbred sent a division order for the Jamie Well that included KC Royalty's interest in the Unit. Those post-sale representations independently establish reliance.

We note that Thoroughbred's reply brief also disputed whether KC Royalty's reliance was detrimental (the third element). Because Thoroughbred raised that argument for the first time in a reply brief, we need not consider it. *Scribner v. U.S.D. No. 492*, 308 Kan. 254, 266, 419 P.3d 1149 (2018); Supreme Court Rule 6.05 (2020 Kan. S. Ct. R. 36).

But even if we do, the argument would fail because substantial evidence supported a detriment finding. By claiming that unit production had extended the Lease, Thoroughbred prevented KC Royalty's royalty interest from expiring and reverting to a working interest. Had that occurred, KC Royalty would have had exclusive rights to develop its interest in the Tract. See *Reynolds-Rexwinkle Oil, Inc. v. Petex, Inc.*, 268 Kan. 840, 846, 1 P.3d 909 (2000). Not so if the Lease was still in place, in which case KC Royalty still would need Thoroughbred's permission to drill an offset well. Indeed, Blair testified that KC Royalty would have immediately drilled 990 feet from the Bird Well had it known that Thoroughbred believed that the conditions precluded unitization. That financial loss from not drilling a competing well supported the detriment finding.

In sum, we find no error in the district court's conclusion that modification, waiver, and estoppel all applied so as to include the Lease in the Unit.

That conclusion makes it unnecessary to consider one issue Thoroughbred raises on appeal. That issue relates to the law of the case rule, which bars a party from relitigating an issue that a court already decided in earlier stages of the same proceeding. *State v. Parry*, 305 Kan. 1189, Syl. ¶ 1, 390 P.3d 879 (2017). On remand, the district court said that it was law of the case that KC Royalty had a 0.0625 working interest in the Unit below the Marmaton-Altamont interval. In the prior appeal, Thoroughbred didn't appeal that issue to the Kansas Supreme Court. In this appeal, Thoroughbred argued that the working-interest finding would not be law of the case if the Lease had never been in the Unit. As we just explained, substantial evidence shows that it was. So the district court's prior finding is law of the case.

26

II. *The District Court Erred When It Gave KC Royalty an Interest Arising from Its Gas Lease to Oil Produced from the Viola Formation*.

Because the Lease is in the Unit, we must now decide the extent of KC Royalty's interest in the Unit. Doing so requires us to review the district court's finding that, under *Skelly*, KC Royalty has an interest in all liquid hydrocarbons produced in the Unit. To better understand this argument, let's examine *Skelly*.

In *Skelly*, a lease provision authorized unitization of "gas rights." 202 Kan. at 240. But that term was undefined other than an exclusion for casinghead gas (gas produced from an oil well). The parties disputed whether the undefined phrase "gas rights" included a liquid-hydrocarbon substance called condensate, also known as distillate, produced by a well covered by the lease. 202 Kan. at 239-40. The court held that it did, so the lessee had to pay royalty for condensate just like it did for gas. 202 Kan. at 247-49.

In reaching that conclusion, the court explored the meaning of condensate. That term, the court explained, refers to the liquid hydrocarbons produced from a gas well (unlike casinghead gas produced from an oil well). These liquids are not oil—they are incidental byproducts produced as a constituent element of the gas. That's a fancy way to say that the gas and liquids are associated in the reservoir—the condensate starts out in a gaseous form underground before temperature and pressure changes cause it to naturally condense into a liquid as it travels with the gas to the surface.

Under *Skelly*, KC Royalty contends that its interest includes all liquid hydrocarbons produced in the Unit. To determine whether that's the case, the Kansas Supreme Court provided three questions for the district court to answer. *Thoroughbred*, 297 Kan. at 1213. We'll tackle the district court's answers to those questions one at a time.

27

First, the district court had to answer the threshold question of whether the Declaration created a gas unit. 297 Kan. at 1213. This question is the trigger for applying *Skelly*—it involved the meaning of "gas rights," so a finding that the Declaration unitized something else would preclude its application. See *Thoroughbred*, 297 Kan. at 1213-14. The district court found that the Declaration created a gas unit because it only included the leases' "gas rights" and the proposed size of 640 acres was much larger than the 40-acre cap on oil units included in the leases. Neither party challenges that finding on appeal, so KC Royalty has an interest in "gas rights."

Second, the district court had to define the "gas rights" to which KC Royalty is entitled payment as a unit member. 297 Kan. at 1213. In other words, did the "gas rights" unitized by the Declaration include condensate? If so, then KC Royalty would have a right to payment for any condensate produced from Unit wells.

*Skelly* answered this legal question by interpreting the lease to determine whether "gas rights" included condensate. The court determined that "gas" included condensate because the parties didn't specifically exclude it from the definition as they had done for casinghead gas and because other provisions contemplated condensate production. See 202 Kan. at 247-48. Although it could have been clearer, the district court here found that the "gas rights" unitized by the Declaration included condensate. Thoroughbred doesn't contest that finding on appeal. So from the first two questions, we know that the Declaration unitized the Lease's gas rights, including condensate.

The last question for the district court was whether the liquid hydrocarbons produced in the Unit were condensate. *Thoroughbred*, 297 Kan. at 1213. We review the district court's answer to this factual question for substantial evidence, meaning legal and relevant evidence that a reasonable person might accept as supporting the court's conclusion. *Gannon*, 298 Kan. at 1175. The district court found that all liquid

28

hydrocarbons produced in the Unit—at every formation—were condensate. To support that finding, the district court compared the liquids produced here to those in *Skelly*.

In *Skelly*, a single well produced gas and liquids from the same formation. Like most wells in the area, the well had no separate zone for oil production. The gas and liquids naturally flowed to the surface together without using pumping equipment to lift the liquids; the gas couldn't "'be produced without carrying with it the associated liquids.'" 202 Kan. at 240. The liquids had a gravity of 47, "'which is in the condensate range and in the excess of the gravity of crude oil.'" 202 Kan. at 241. (Gravity, often expressed as a number on a scale created by the American Petroleum Institute, is a metric used to distinguish different liquid hydrocarbons. 8 Williams & Meyers, Manual of Oil and Gas Terms, p. 53.) What's more, the Kansas Corporation Commission had classified the well as a gas well because it always had a gas-to-oil ratio exceeding 15,000 to 1. *Skelly*, 202 Kan. at 240-41. That ratio was uniform throughout the unit. Under these facts, the liquids were condensate.

For all but the Viola formation, substantial evidence supported a finding that the liquid hydrocarbons produced in the Unit were condensate. The district court found that Unit liquids were associated and produced with the gas, and substantial evidence supported that finding for all non-Viola formations. An affidavit from Thoroughbred's expert geologist Paul Gunzelman analyzed the producing formations in the area and concluded that the Lansing, Kansas City, Marmaton, Altamont, and Mississippian formations all produced associated condensate. And detailed production reports Thoroughbred submitted at trial for each unit well showed that in every formation but the Viola, gas production far exceeded oil production. Gunzelman's affidavit and Thoroughbred's production data provided ample evidence from which the district court could have concluded that liquids produced from these formations were condensate.

29

The same cannot be said about the Viola. The Viola distinguishes our case from *Skelly* because there, the gas and condensate existed in the same formation; there was no separate oil-producing formation. But here the undisputed evidence shows that the Viola was a separate, oil-producing formation. For the Unit wells that produced in that formation, oil production far exceeded gas production. Thoroughbred's detailed production reports show that three wells produced much more oil than gas in the Viola:

| Well | Oil (bbls) | Gas (mcf) |
|---|---|---|
| Blackshirt | 102,605 | 11,344 |
| Husker | 107,743 | 28,106 |
| Tunnelwalk | 55,516 | 10,308 |

Neither the district court nor KC Royalty has cited any evidence that the hundreds of thousands of barrels of oil produced in the Viola were condensate.

To be sure, these three wells produced more gas than oil overall if you consider all formations. But not by much. The Blackshirt and Husker Wells had an overall gas-to-oil ratio of about 1.5:1 and 1.4:1 respectively; the Tunnelwalk Well, about 4.5:1. Those ratios seem microscopic compared to the *Skelly* well ratios. In *Skelly*, the well started with a gas-to-oil ratio of 93,617:1; it increased over the well's lifetime to more than 200,000:1. 202 Kan. at 240. What this data shows is that the Viola liquids were oil, not condensate.

The district court reached the opposite conclusion mostly by relying on Gunzelman's affidavit and Patton's testimony. The affidavit said that the Viola produced oil and gas. Oil is not condensate, so that statement cannot support a finding that Viola liquids were condensate.

That leaves Patton's testimony. The district court cited no specific part of Patton's testimony, but our review of it reveals only one statement on which the district court could have relied. In that statement, Patton answered "Yes" in response to a question from his attorney about whether "Viola oil produce[s] condensate." Keep reading, however, and you'll quickly discover that his attorney used "condensate" to refer both to condensate and casinghead gas. So Patton's response was simply an acknowledgement that the Viola wells produced some casinghead gas. Read any other way, his attorney's question makes no sense because, as we mentioned above, only gas wells produce condensate. Neither Patton's testimony nor Gunzelman's affidavit showed that the Viola liquids were condensate rather than oil.

In short, substantial evidence supported a finding that all liquid hydrocarbons produced in the formations above the Viola were condensate. But no evidence supported a condensate finding for the Viola, which produced oil. *Skelly* lets the owner of pooled gas rights benefit from oil that is *incidentally* gathered as part of the process of producing the gas. Production of oil in the Viola was not merely incidental to gas production. So KC Royalty's interest in the Unit includes liquid hydrocarbons produced from the Lansing, Kansas City, Marmaton, Altamont, and Mississippian, but not from the Viola.

One last point before we move on to address KC Royalty's cross-appeal. Much of the evidence the district court cited on this issue is irrelevant to whether liquid hydrocarbons are in fact condensate. For example, the court noted that the Lease required royalty payment for all "production," just as in *Skelly*. And it cited Thoroughbred's description of the Unit as a "multizone play" and Thoroughbred's intent for unit wells to target the same formations as the Bird Well. None of that evidence affects the factual issue of whether the Viola liquids were condensate.

We note the district court's reliance on irrelevant factors to provide guidance for future cases. The touchstone of a condensate analysis is whether the liquids are

31

constituent elements of the gas produced as its incidental byproduct. That is, whether the liquids existed in a gaseous form in the same producing formation as the gas and naturally liquified by changes in temperature and pressure as they traveled to the surface. A variety of evidence could affect this inquiry, including the gravity of the liquids, geological features of the reservoir, gas-to-oil ratios, extraction and pumping methods used, and any other legally relevant evidence. See *Skelly*, 202 Kan. at 240-42. Because substantial evidence supported a finding that Unit liquids produced in all formations other than the Viola were condensate, we affirm the district court's conclusion that KC Royalty was entitled to share in oil-production royalties in all formations above the Viola. We reverse the district court with respect to oil production from the Viola. Because new calculations of the royalties and interest owed will be required, we remand to the district court for that purpose.

III. *The District Court Did Not Abuse Its Discretion in Denying Attorney Fees to KC Royalty*.

The last issue we consider is KC Royalty's cross-appeal challenging the district court's decision not to award attorney fees. Kansas courts can award attorney fees only if a statute authorizes them or the parties agree to allow them. Whether the district court had the authority to award attorney fees is a legal question subject to unlimited review on appeal. If the court had authority, we review the amount of fees awarded for abuse of discretion. A district court abuses its discretion if it bases its decision on legal or factual error, or if no reasonable person would agree with the decision. *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, Syl. ¶¶ 2-3, 6, 298 P.3d 1120 (2013).

KC Royalty alleges that the district court committed two legal errors when it denied attorney fees. First, KC Royalty says the district court erred in deciding on its own motion not to award attorney fees. According to KC Royalty, doing so violated the rule that a trial court cannot consider nonjurisdictional issues that the parties didn't raise

themselves. *Frontier Ditch Co. v. Chief Engineer of Div. of Water Resources*, 237 Kan. 857, Syl. ¶ 3, 704 P.2d 12 (1985).

To be sure, deciding whether to award attorney fees isn't a jurisdictional issue. But here, KC Royalty invited the district court to decide the issue.

In a posttrial motion, KC Royalty asserted that it was entitled to attorney fees and requested a separate hearing to determine the amount of those fees. By taking a position on its entitlement to attorney fees, KC Royalty invited the district court to decide that issue. The district court accepted that invitation and found that KC Royalty should not receive attorney fees under the relevant statute. So the court didn't commit a legal error by deciding in its written decision that KC Royalty should not recover its attorney fees.

Second, KC Royalty says that the district court was required by K.S.A. 55-1617 to award attorney fees to it as the prevailing party. Under that statute, a prevailing party in a case to recover interest on certain oil-and-gas payments "may recover court costs and reasonable attorney fees at the discretion of the court." K.S.A. 55-1617. Citing our prior opinion, KC Royalty claims that K.S.A. 55-1617 requires the district court to award attorney fees to the prevailing party absent a compelling reason not to. *Thoroughbred*, 45 Kan. App. 2d at 334. Because the district court cited no compelling reason here, KC Royalty says the court had to award fees to it as the prevailing party.

But as Thoroughbred points out, our prior opinion also emphasized the discretionary nature of K.S.A. 55-1617. 45 Kan. App. 2d at 335. The provision uses discretionary language to describe the district court's authority to award fees: the prevailing party "may recover" fees "at the discretion of the court." K.S.A. 55-1617. Kansas courts have long recognized that the usual meaning of "may" is permissive. *Bradley v. Cleaver*, 150 Kan. 699, Syl. ¶ 1, 95 P.2d 295 (1939). And "at the discretion of the court" only emphasizes that usage. K.S.A. 55-1617.

33

Our prior decision doesn't endorse a mandatory reading of K.S.A. 55-1617. Although we described that provision as a "strict liability remedy," we did so in the context of rejecting an argument that a court couldn't award fees unless a party acted in bad faith. *Thoroughbred*, 45 Kan. App. 2d at 334-35. Neither party addressed the mandatory-versus-permissive issue in the earlier appeal, and we didn't decide it. We follow K.S.A. 55-1617's plain language and conclude that it does not make the award of attorney fees to the prevailing party mandatory.

KC Royalty raises one last argument—that no reasonable person would agree with the district court's decision to order that the parties pay their own attorney fees. Success on that argument is a tall order because we usually defer to the district court's expertise on attorney fees unless justice requires otherwise. *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, Syl. ¶¶ 3-5, 135 P.3d 1127 (2006).

The district court here found mitigating factors that weighed against awarding attorney fees to KC Royalty as the prevailing party. The genesis of this case, the court noted, was Oxy inserting the unitization conditions in the Lease. So it would be unfair to award fees to KC Royalty, who overlooked those conditions when it acquired the Lease. That was consistent with the court's separate finding that the parties had unitized the Lease by modification, waiver, or equitable estoppel. It was possible to acknowledge KC Royalty's role in the dispute as a reason to deny attorney fees but also to find that the parties had unitized the Lease.

Having lived with this case for almost two decades now, the district court was in the best position to decide whether KC Royalty should receive attorney fees. We defer to its judgment. Because a reasonable person could agree with the decision to require all parties to pay their own attorney fees, the district court didn't abuse its discretion.

34

We reverse the district court's judgment to the extent that it awarded any interest to non-gas royalties from production in the Viola formation. We otherwise affirm the district court's judgment. We remand the case to the district court for further proceedings consistent with this opinion.